[No. B075096. Second Dist., Div. Three. June 2, 1994.]

ARNOLD R. ABRAMS et al., Plaintiffs and Appellants, v.
ST. JOHN'S HOSPITAL AND HEALTH CENTER, Defendant and
Respondent.

**COUNSEL**

Mitchell, Silberberg & Knupp, Arthur Fine, Douglas W. Bordewieck and Jeffrey D. Goldman for Plaintiffs and Appellants.

McDermott, Will & Emery, Donald A. Goldman, Lee L. Blackman and Thomas A. Ryan for Defendant and Respondent.

**OPINION**

**CROSKEY, J.**—Plaintiffs Arnold R. Abrams, M.D. (plaintiff or Dr. Abrams) and Arnold R. Abrams, M.D., a professional corporation (professional corporation or medical corporation) appeal from an order denying their request for a preliminary injunction. Plaintiffs sought an injunction prohibiting the defendant St. John's Hospital and Health Center (hospital) from terminating a contract between the medical corporation and hospital without first complying with certain contract provisions, hospital bylaws and California case law. The trial court denied the injunction because (1) it found plaintiff was not likely to succeed on his contract cause of action and (2) there were adequate remedies at law with respect to his tort causes of action.

In this appeal, we determine that doctors who obtain exclusive contracts to supply medical services to hospitals are bound by the contractual termination provisions to which they have agreed. These doctors are to be contrasted with other staff physicians who do not hold these exclusive contracts but who are entitled to certain due process hearing rights pursuant to hospital and medical staff bylaws.

Specifically, we consider the enforceability of an agreement between a hospital and a member of its medical staff where the member has contracted away due process hearing rights otherwise afforded him or her by existing hospital and medical staff bylaws, rights which he or she would otherwise

enjoy if and when the hospital ever decided to terminate the member's medical staff membership and privileges. We find such agreements can generally be enforced unless a contrary result is required by certain provisions of the Business and Professions Code. As there appears to be no such statutory impediment to enforcement in this case, we conclude that the trial court did not abuse its discretion in finding that plaintiffs had failed to demonstrate a likelihood of success on their breach of contract cause of action. We therefore affirm the order denying injunctive relief.

## BACKGROUND OF THE CASE

### 1. *The Relationship of the Parties*

Defendant hospital is a not-for-profit corporation. Hospital operates its pathology department on an exclusive contract basis; this arrangement is also known as a "closed" department. This means that the hospital contracts with an independent contractor who provides it with all of the pathology services it needs. This includes employing doctors to staff the hospital's pathology department and employing a director for the department.

Plaintiffs' relationship with hospital began in 1975 when Dr. Abrams joined hospital's medical staff, working in its pathology department for various independent contractors. During his 17 years of work at the hospital, plaintiff was responsible for upgrading the pathology department in many areas. During the period of time plaintiff headed hospital's pathology department, that department received excellent ratings during inspections by outside agencies and organizations.

In October 1988, plaintiff medical corporation signed a contract with hospital whereby the medical corporation became the independent contractor to provide pathology services to hospital. Under the terms of this 1988 agreement, the plaintiff corporation would provide Dr. Abrams's services as an interim medical director of the department.

In November 1992, the hospital and the plaintiff professional corporation entered into a new agreement (the contract). Under the contract, the professional corporation was to again provide hospital with a qualified medical director of the pathology department. The contract recites that hospital approved Dr. Abrams as that director. It provides that either party to the contract can terminate the contract by providing the other with 90 days' written notice and either party can terminate the contract for cause (material breach or default of the contract) by giving 30 days written notice.

There are contractual provisions relating to medical staff membership. First, Dr. Abrams and the staff pathologists hired by plaintiff medical

corporation must maintain membership on hospital's medical staff. Second, under an "automatic termination of medical staff membership and privileges" provision, the medical staff membership and privileges of plaintiff doctor and the staff pathologists terminate automatically upon the expiration or other termination of the contract. The contract states that this automatic termination "is not subject to, and thus does not entitle [the plaintiff medical corporation], [the plaintiff doctor] or any [staff pathologist] to, the hearing and appellate review rights under the Hospital or Medical Staff bylaws, unless otherwise expressly and explicitly required by applicable federal or state law."

Additionally, the contract has a provision which states: "As a condition of Hospital's approval of each [staff pathologist's] Medical Staff membership and privileges and of each [staff pathologist's] provision of professional medical and clinical laboratory services hereunder, [the plaintiff medical corporation] shall require each [staff pathologist] to execute a written Acknowledgement and Waiver which without limitation waives, unless such waiver is expressly and explicitly prohibited by applicable federal or state law, any rights that such [staff pathologist] may have to any hearing and appellate review under the Hospital or Medical Staff bylaws with respect to, as well as any and all other legal rights to challenge or appeal the suspension or termination of, such [staff pathologist's] Medical Staff membership and privileges." Although this provision recites that it is the staff pathologists who are to sign this acknowledgement and waiver, Dr. Abrams also signed it.

The "acknowledgement and waiver" recites in part: "[the undersigned] . . . agrees to waive, unless such waiver is expressly and explicitly prohibited by applicable federal or state law, any rights which [the undersigned] may have to any hearing and appellate review under the Hospital or Medical Staff bylaws with respect to, as well as any and all other legal rights to challenge or appeal the suspension or termination of, [the undersigned's] Medical Staff membership and privileges at Hospital."

There is a general provision in the contract regarding "disagreements." It states: "In the event that there is any disagreement with regard to billing or compensation matters, the staffing and selection of non-physician personnel, or the provision of medical administrative services hereunder by [the plaintiff doctor], such disagreement may be referred by either party hereto to the President of Hospital for additional consultation. Any questions or disagreements concerning standards of professional practice or the character of professional medical and clinical laboratory services performed in the [pathology] Department may be referred by either party to the Executive Committee of the Medical Staff for additional consultation."

## 2. *Hospital's Termination of the Contract*

Sometime in 1991, hospital learned that Dr. Abrams had made statements in a deposition, taken in a malpractice action, relating to certain practices in hospital's pathology department. Hospital considered these statements erroneous; plaintiffs admit they were. The statements concerned hospital's practice regarding what is done when tissue which has been submitted to the department for analysis is insufficient to make the analysis. At his deposition, Dr. Abrams testified that the pathology department never put into its written reports that a specimen was inadequate or insufficient but rather verbally told the physician submitting the specimen that it was not adequate. Abrams stated that such information was never put into any report because referring physicians did not want it in the report and "it was quite clear that once [the pathology department put it in a written report, the hospital] would never see another specimen from that physician."

Dr. Abrams's deposition was taken in May 1991, and he and hospital were added as defendants to the malpractice lawsuit in July 1991. On December 7, 1992, hospital met with plaintiff and his attorney about his deposition statements, and plaintiff made offers to correct them by way of declaration and testimony, offers which the hospital states it considered less than satisfactory.

The parties disagree as to plaintiff's culpability for the deposition statements and also disagree on whether plaintiff acted in the best interests of the hospital, in his offers to deal with his deposition errors, after he was questioned about his statements. However, in any event, hospital contends it decided it no longer had trust and confidence in plaintiff because of the "veracity of Dr. Abrams" with respect to his deposition testimony. According to hospital's chief executive officer, the decision to terminate plaintiff was "not based on quality of care issues or on Dr. Abrams' medical competence." The CEO testified in a deposition that hospital believes plaintiff's testimony put into question plaintiff's professional integrity, professional honesty, professional judgment and professional ability to run the pathology department and supervise the people in it.

Thereafter, on January 27, 1993, hospital gave plaintiffs notice it was terminating the contract under its "without cause" provisions and the termination was to be effective on April 27, 1993. Pursuant to the provisions in the contract which address automatic termination of hospital staff membership and privileges, hospital considered Dr. Abrams's medical staff membership and privileges also terminated as of the April 27 date.

Hospital's notice of termination of the contract was delivered to plaintiff without prior notice to him that hospital was considering taking such action and without an opportunity to appear before any or all of hospital's directors to be heard on the matter, particularly the executive committee of the board of directors who voted on the termination. The executive committee took the vote of termination at a meeting on January 22, 1993.

Hospital's chief executive officer (CEO) testified at her deposition that had she been aware that plaintiff had offered to sign a declaration which corrected his deposition errors she would have regarded that as significant. When asked if the members of the executive committee were informed that plaintiff's attorney had informed hospital that plaintiff was willing to testify that he made a mistake in his deposition, the CEO answered, "To my knowledge, that was not included." She also testified that the executive committee members were not shown the letter from plaintiff's attorney, dated December 9, 1992, wherein it was stated that plaintiff would be willing to testify or sign a declaration correcting his testimony.

### 3. *Dr. Abrams's Attempts to Retain Staff Membership*

Plaintiff demanded that hospital comply with its bylaws by giving him a quasi-judicial hearing on its desire to terminate the contract. Plaintiff also requested that he be permitted to appear before the board and discuss the termination. According to the CEO, the full board met by telephone to discuss his request; they decided to deny it. According to hospital's general counsel, plaintiff also requested that the board reconsider its decision to terminate the 1992 contract and the board decided not to change its decision to terminate.

Plaintiffs filed this action on April 9, 1993, along with a motion for a preliminary injunction to prohibit hospital from terminating the 1992 contract effective April 27, 1993. In their complaint, plaintiffs alleged causes of action for, among other things, breach of contract, slander, and negligent misrepresentation. In connection with their breach of contract causes of action, they requested preliminary and permanent injunctions. The motion for a preliminary injunction was denied and the appeal before us now is from the order denying that motion.

### DISCUSSION

### 1. *Standard of Review*

In determining whether to issue a preliminary injunction, the trial court considers two factors: (1) the likelihood that the plaintiff will prevail

on the merits of its case at trial and (2) the interim harm that the plaintiff is likely to sustain if the injunction is denied as compared to the harm that the defendant is likely to suffer if the court grants a preliminary injunction. The latter factor involves consideration of such things as the inadequacy of other remedies, the degree of irreparable harm, and the necessity of preserving the status quo. The determination whether to grant a preliminary injunction generally rests in the sound discretion of the trial court. (*Cohen* v. *Board of Supervisors* (1985) 40 Cal.3d 277, 286 [219 Cal.Rptr. 467, 707 P.2d 840].) ■ "When a trial court denies an application for a preliminary injunction, it implicitly determines that the plaintiffs have failed to satisfy either or both of the 'interim harm' and 'likelihood of prevailing on the merits' factors. On appeal, the question becomes whether the trial court abused its discretion in ruling on *both* factors. Even if the appellate court finds that the trial court abused its discretion as to one of the factors, it nevertheless may affirm the trial court's order if it finds no abuse of discretion as to the other." (*Id.* at pp. 286-287.)

In the instant case, the trial court determined that plaintiffs would probably not prevail in their breach of contract cause of action. The court further found that plaintiffs and defendant would all suffer harm if the court forced a relationship between the two sides and that plaintiffs would not be irreparably harmed if denied a preliminary injunction because their legal remedies are adequate.

## 2. *The Likelihood of Plaintiff's Success on the Merits*

■ Generally, when a hospital wishes to terminate the staff privileges of a doctor, it must do so in a "procedure comporting with the minimum common law requirements of procedural due process" wherein it is shown that the hospital has "adequate cause" for termination. (*Anton* v. *San Antonio Community Hosp.* (1977) 19 Cal.3d 802, 815, 825 [140 Cal.Rptr. 442, 567 P.2d 1162] [hereinafter *Anton*].) The right of a qualified physician to use the facilities of a hospital is fundamental; it is a property interest which directly relates to the pursuit of the physician's livelihood. (*Id.* at p. 823.)

An exception is made when terminations of staff privileges are incidental to a hospital's reorganization of one of its departments. In such cases, the terminations are the result of administrative/quasi-legislative decisions, rather than adjudicatory/quasi-judicial decisions about a doctor, and hence do not require a due process hearing. (*Mateo-Woodburn* v. *Fresno Community Hospital & Medical Center* (1990) 221 Cal.App.3d 1169, 1183 [270 Cal.Rptr. 894] [hereinafter *Mateo-Woodburn*].)

In *Mateo-Woodburn*, the defendant hospital made a decision to change its method of providing anesthesia services from a rotating "open staff" arrangement to a "closed" system. To accomplish this, the hospital entered into a master contract with a medical professional corporation for said corporation to provide for the hospital's anesthesia needs. The corporation, William H. Hass, M.D., a professional corporation, hired William Hass, M.D. to direct the anesthesia department. The corporation in turn contracted with anesthesiologists for their services. The contracts between the corporation and the anesthesiologists (1) required said doctors to be members of the hospital staff; (2) were for a one-year term which was subject to termination on sixty days' notice; and (3) required the contracting doctor to waive any hearing rights he or she might otherwise have had under the hospital's medical staff bylaws. The contracts also provided that termination of the contract between the professional corporation and a contracting doctor would terminate that doctor's right to practice as an anesthesiologist at the hospital.

Several of the anesthesiologists who had been practicing at the hospital under its open staff arrangement challenged the new closed policy, including the terms of the contracts which the professional corporation was offering them. The *Mateo-Woodburn* court determined that (1) the decision to go to a closed arrangement was valid because it was not irrational, arbitrary, unlawful, contrary to public policy or procedurally unfair; (2) the plaintiffs' loss of the right to practice anesthesiology at the hospital was the indirect result of the administrative decision to change to a closed arrangement rather than an attempt to exclude particular physicians, and therefore, their loss of staff privileges did not require a "due process" *Anton*-type hearing; (3) the requirement by the Hass professional corporation that anesthesiologists contract for their positions was simply part of the overall decision to close the department; and (4) the provisions in the contracts offered by the Hass professional corporation, including the provision which required contracting doctors to waive hearing rights contained in the medical staff bylaws, were permitted because they were not substantially irrational or arbitrary and did not illegally discriminate among the various doctors.

Regarding the medical staff hearing rights which were being waived, the court stated that they "do not exist under the circumstances of a quasi-legislative reorganization of a department by the board of trustees. This quasi-legislative situation is to be distinguished from a quasi-judicial proceeding against an individual doctor grounded on unethical or unprofessional conduct or incompetency. Accordingly, the waiver did not further detract from or diminish plaintiffs' rights." (*Mateo-Woodburn, supra*, 221 Cal.App.3d at pp. 1187-1188.)

Given this state of the law, we find the trial court in the instant case did not abuse its discretion when it found that plaintiffs were not likely to prevail on the breach of contract cause of action. *Mateo-Woodburn* appears to dispose of plaintiffs' contention that Dr. Abrams was entitled to an *Anton*-type hearing before his contractual rights and staff rights could be terminated. Although he asserts that his termination of staff privileges and membership was not *incidental* to a reorganization like that of the doctors in *Mateo-Woodburn* but rather was the result of actions *directed specifically at him*, this "incidental vs. direct" analysis used by the *Mateo-Woodburn* court no longer applies in the case before us because the package of contract rights which he received in his contract replaces it. From the evidence before us, it can be found that Dr. Abrams contracted away the rights he had under the medical staff bylaws.

Our conclusion is not altered by plaintiffs' assertion that the hospital failed to comply with its own bylaws requiring consultation with its medical staff regarding alterations of staff status. From the contractual waiver language agreed to by plaintiffs, it appears plaintiffs contractually waived their rights to hearing and appellate review otherwise given to them by the medical staff bylaws *and* the hospital staff bylaws.

Additionally, no purpose would be served by having the medical staff make recommendations regarding the termination of Dr. Abrams's staff membership and privileges, since his membership and privileges are governed by contract. While the contract does have a provision for "disagreements" between hospital and the medical corporation, the provision (1) arguably relates to disagreements during an *ongoing* relationship whereas here the disagreement stems from hospital's use of its "termination without cause" rights, and (2) provides for either party to refer to the executive committee of the *medical staff* the matter for "additional consultation." The executive committee of the medical staff advised Dr. Abrams it would not involve itself in the matter because it believed the dispute to be a contractual one.

We reject plaintiffs' contention that the waivers given by them in their contractual arrangements with hospital are unenforceable because they "waive the benefits of law designed, directly or indirectly, to further and protect the interests of an identifiable subset of the public at large [namely,] those of (a) the Hospital's medical staff, who necessarily rely daily on diagnoses by Hospital pathologists; and (b) patients seeking and receiving care at the Hospital." (Italics deleted.) While we acknowledge that reasonable peer review of health care providers is necessary for those providers,

their patients and the public at large, the waivers given by plaintiffs are in essence no different from the waiver of rights approved of in *Mateo-Woodburn*.[1] Besides, it is quite possible that when hospital decided many years ago to make the pathology department a closed department, it did so because it rationally determined that both doctors and their patients would be best served by that arrangement.

Defendant notes that waivers of peer review rights are addressed in Business and Professions Code section 809.6, which provides that a health care provider's rights to review of a "final proposed action" of a peer review body may not be waived by contract, agreement, professional society or medical staff bylaws when the final proposed action to be taken against that provider is one "for which a report is required to be filed under Section 805." Section 805, subdivision (b) requires a report to be filed with the "relevant agency" whenever a health care provider's "membership, staff privileges, or employment is terminated or revoked for a medical disciplinary cause or reason." That is not the case here. We thus agree with defendant that section 805 does not come into play in this case. Therefore, we need not address the issue of whether section 809.6 would ever impact contractual relationships involving closed departments.

### 3. *The Question of Interim Harm*

The trial court determined that plaintiffs will not be irreparably harmed because their tort causes of action give them sufficient remedies at law. On appeal, plaintiffs challenge this determination. However, having determined that they have no likelihood of prevailing on the merits of their breach of contract cause of action, this alternative reason for denying the injunction need not be addressed.[2]

---

[1]The waivers given by the staff anesthesiologists in *Mateo-Woodburn* differ from those addressed in the instant case in that here, the termination of the contract between plaintiff medical corporation and hospital results in the total termination of medical staff membership for Dr. Abrams and his staff doctors; in *Mateo-Woodburn*, the termination of an individual staff anesthesiologist's contract only terminated his or her right to practice anesthesiology at the hospital; the termination did not otherwise effect the doctor's medical staff membership there. We find this to be a distinction without a difference. It is simply a matter of how the hospitals chose to arrange their closed departments.

[2]We do note parenthetically that it would appear the trial court was correct in concluding that whatever legal injuries plaintiffs may have sustained, they may be adequately compensated by a judgment for money damages. If so, there was no irreparable harm to plaintiffs in any event. (*Department of Fish & Game* v. *Anderson-Cottonwood Irrigation Dist.* (1992) 8 Cal.App.4th 1554, 1564-1565 [11 Cal.Rptr.2d 222].)

## DISPOSITION

The order appealed from is affirmed. Costs on appeal to defendant.

Klein, P. J., and Kitching, J., concurred.