[Nos. A131235, A131689. First Dist., Div. One. Apr. 30, 2012.]

SYED ALI HUSAIN et al., Plaintiffs, Cross-defendants and Respondents, v. McDONALD'S CORPORATION et al., Defendants, Cross-complainants and Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II.C., D.

COUNSEL

Kirkland & Ellis, Christopher Keegan and Jonathan C. Bunge for Defendants, Cross-complainants and Appellants.

Lagarias & Boulter, Robert S. Boulter and Peter C. Lagarias for Plaintiffs, Cross-defendants and Respondents.

OPINION

MARGULIES, J.—McDonald's Corporation (McDonald's) and related parties appeal from orders granting a preliminary injunction to Syed Ali Husain and Khursheed Husain (the Husains) permitting the Husains to continue operating three McDonald's restaurants in Marin County pending completion of a trial in this action. We affirm the orders.

## I. FACTUAL AND PROCEDURAL BACKGROUND

A. *Factual Background*

Husain and his wife have owned McDonald's franchises since the early 1980's. By 2005, they held five McDonald's franchises in San Francisco and Daly City. In June 2005, the Husains entered into an agreement with third parties (the Magruders) to purchase an additional seven McDonald's restaurants in Marin County. The Magruders' franchise agreements with McDonald's required they obtain McDonald's consent to the transfer of ownership. In two separate assignment agreements between the Husains, the Magruders, and McDonald's, McDonald's consented to the Magruders' assignment of their franchise agreements to the Husains.[1] The dispute in this case centers on whether McDonald's made an enforceable promise to the Husains to extend or "rewrite" the franchise terms for three of the restaurants—Novato, Fourth Street, and Merrydale—either in the Assignment Agreement or otherwise.

When McDonald's opens a new restaurant or rewrites an existing franchise, it normally grants franchise rights for a 20-year term, absent lease tenure issues. However, the Corte Madera, Northgate, Novato, Fourth Street, Merrydale, and Mill Valley locations all had five years or less remaining in

---

[1] The assignment agreement primarily in issue involved six restaurants designated in the record as Novato, Fourth Street, Merrydale, Corte Madera, Northgate, and Hamilton (the Assignment Agreement). Because the Magruders held the franchise agreement for the seventh location, Mill Valley, in a different form of ownership, a second assignment agreement covering the Mill Valley location was necessary (the Mill Valley Assignment Agreement).

their franchise terms at the time of the Husains' purchase. Only the Hamilton franchise, not due to expire until 2019, had substantially more than five years left to run.[2]

The Husains assumed considerable financial obligations in connection with the purchase of the new locations. Pursuant to McDonald's borrowing guidelines, the Husains financed the purchase of the Marin franchises with a seven-year, $10.5 million note, refinanced in 2007 by a seven-year, $9.35 million note, which was secured by all of the fixtures and equipment at the Husains' existing and newly acquired restaurants. The loans also financed approximately $800,000 in renovations and other "reinvestment" at the Marin franchises which McDonald's required the Husains to complete by August 16, 2006, under the assignment agreements. The Husains acknowledged in the agreements timely completion of these reinvestments was a material term of the Magruder franchise agreements which they were assuming.

Paragraph 17 of the Assignment Agreement stated in relevant part as follows: "In consideration of McDonald's consent to this Assignment *and the issuance of a rewrite to Assignee*, Assignor waives, releases, and disclaims any claim for a rewrite of the franchise for the Corte Madera . . . location." (Italics added.) Paragraph 17 goes on to include a general release releasing McDonald's from any possible future claims by the Magruders, including claims arising from the Corte Madera franchise. The Husains contend paragraph 17 constitutes McDonald's promise to the Husains that it would rewrite the franchise agreements for all of the restaurants covered by the Assignment Agreement with the exception of the Hamilton location, which had more than 10 years remaining on its franchise. McDonald's contends the paragraph promises only that it would rewrite the Corte Madera franchise agreement since it had already denied the Magruders a rewrite for that franchise.[3]

There is no dispute McDonald's did offer the Husains new 20-year franchise terms in January 2006 for the Novato, Fourth Street, and Merrydale franchises under a program known as "Plan to Win." Under the program, after the sale of a franchise between existing McDonald's operators, a new 20-year franchise term would be offered to the purchaser if the remaining

---

[2] Northgate, Corte Madera, Mill Valley, and Hamilton are not in dispute. The parties agree that McDonald's did promise to rewrite the Corte Madera and Mill Valley franchises. However, Corte Madera (and Northgate) closed before this suit was filed due to unrelated lease issues. McDonald's rewrote the Mill Valley franchise shortly after the Husains purchased it. The parties further agree McDonald's made no promise to rewrite the Hamilton franchise, which had a much longer term remaining when the Husains purchased it than any of the other Marin franchises.

[3] Under an identically worded paragraph 17 in the Mill Valley Assignment Agreement, McDonald's promised the Husains a rewrite of the Mill Valley franchise which it had previously denied to the Magruders.

term for the acquired restaurant was less than 10 years and certain other criteria were met. The purchaser would have to agree to pay a prorated portion of the $45,000 initial franchise fee McDonald's charged for new 20-year franchise terms. In January 2006, Jodi Breen of McDonald's sent Husain three offer letters offering, respectively, to extend the terms on the Husains' Novato, Fourth Street, and Merrydale franchises to 2025. The offers required Husain to pay prorated initial franchise fees totaling approximately $119,000 for the three locations.

McDonald's denied receiving any response from Husain to the offers. Breen testified she left a voice mail message for Husain after the deadline for responding to the offers had passed, but got no response. In March 2006, Breen sent Husain a letter confirming she had received no response to the offers and advising him the offers were no longer on the table. Husain denied receiving the March letter.

Husain contended he did timely accept the offers by mailing his signed acceptance from the Capuchino Station Post Office in Burlingame on January 21, 2006, and he submitted a copy of a post office "CERTIFICATE OF MAILING" to substantiate that contention. McDonald's presented evidence the Capuchino post office branch was closed on January 21, 2006, and called an expert to establish Husain could have easily fabricated the certificate of mailing.

As of the summer of 2006, the Husains had not begun the vast majority of the reinvestment work they were supposed to have completed by that time. However, according to a business review McDonald's completed in August 2006, the Husains' restaurants "[met] all of the National Franchising Standards and [were] eligible for growth and rewrite."

In 2006 and 2007, the Husains suffered business setbacks, including financial losses caused at least in part by a store manager's embezzlement from one of the San Francisco stores, which was not discovered until April 2008. According to the manager's confession to police, his embezzlement began in the fall of 2006 and was ongoing until he was tripped up after the installation of a new computer software program in 2008. The Husains began falling consistently behind in their payment of fees and rent to McDonald's beginning in December 2006, and also missed payments to the regional operators' cooperative (for coordinated advertising) and their primary food distributor. By the summer of 2007, the Husains owed McDonald's over $540,000 and the cooperative over $200,000. McDonald's threatened to terminate the Husains' franchises if these arrearages were not paid in full. In July 2007, Husain borrowed $450,000 on his home and brought himself current with McDonald's and the advertising cooperative. There were no further arrearages after that point.

Husain contended the 2007 financial issues took him by surprise and he attributed them primarily to the employee embezzlement that was discovered later.[4] He testified he believed at the time someone had hacked into his bank accounts. McDonald's offered evidence Husain was fully informed all along about the growing arrearages, and he was less than candid with McDonald's about the causes of the problem, telling the company falsely the bank was investigating the possible hacking of his McDonald's accounts. By all accounts, the parties' business relationship soured in 2007, and McDonald's began warning Husain it was not going to approve future rewrites of his franchises, pointing to his substantial arrearages in 2006 and his continued failure to complete agreed reinvestment work on his restaurants.

Unless rewritten by McDonald's, the franchise term for the Novato restaurant was due to expire on December 26, 2009. In 2008, the Husains had still not completed the agreed-upon reinvestment work on the Novato restaurant, including the enclosure of its restrooms. The McDonald's Rewrite Committee (Rewrite Committee) met on December 15, 2008, and voted not to offer the Husains a new franchise term for the Novato restaurant, citing the Husains' financial condition as reflected in their past failure to timely pay their debts to McDonald's, and their continuing failure to live up to their contractual reinvestment obligations, which McDonald's believed was having a negative impact on its brand image. A month before the final decision, McDonald's invited the Husains to submit any relevant information they wished to offer on the issue of the rewrite for the three franchises in issue. In response, Husain submitted a written narrative and a large packet of documents, and spoke at length with a McDonald's representative about the issue. He did not mention in any of his submissions or conversations either that he believed McDonald's had promised him new 20-year franchise agreements for the Marin restaurants as part of the Magruder transaction, or that he had signed and returned the Breen "Plan to Win" offer letters in January 2006.

Following the Rewrite Committee's decision, McDonald's urged the Husains to sell the three Marin franchises prior to their expiration dates. To facilitate the sale, McDonald's offered to grant new franchise terms for the restaurants to any approved purchasers. McDonald's contends this was consistent with the policy assertedly reflected in paragraph 17 of its two assignment agreements with the Husains that after denying an operator a rewrite for a franchise it would assist the operator in selling the franchise by agreeing to rewrite it for an approved purchaser.

---

[4] Husain's office manager estimated the store manager had embezzled approximately $108,000 between 2005 and 2008, but Husain testified the full amount was unknown and untraceable due to missing records.

B. *Injunction Proceedings*

The Husains advised McDonald's they did not intend to sell the stores, and filed this lawsuit in December 2009. The Husains sought injunctive relief to prevent McDonald's from removing them from the Novato restaurant on December 26, 2009, when their franchise expired. McDonald's cross-complained, and applied for a preliminary injunction requiring the Husains to surrender the restaurant.

The trial court set an evidentiary hearing on the competing motions, permitting the Husains to remain in the Novato restaurant in the interim. More than 10 days of evidentiary hearings were held in May, June, July, August, and September 2010. The trial court issued its written ruling on December 20, 2010, by which time the Husains' franchise agreements for Fourth Street and Merrydale had also expired. The court denied McDonald's motion, granted the Husains' motion, and issued a preliminary injunction requiring McDonald's to permit the Husains to continue operating the three restaurants in issue during the pendency of the suit. The court found paragraph 17 of the Assignment Agreement was ambiguous and susceptible to the meaning ascribed to it by the Husains, and that some of the extrinsic evidence supported the Husains' interpretation. The court also found the balance of harms resulting from an error in granting or denying interim injunctive relief weighed strongly in the Husains' favor.

McDonald's timely appealed from the court's December 20, 2010 ruling (case No. A131235) and from an ensuing order granting the Husains' preliminary injunction motion and denying McDonald's motion (case No. A131689).

## II. DISCUSSION

McDonald's contends the trial court prejudicially erred in (1) granting injunctive relief to prevent the breach of a contract for personal services that, as a matter of law, cannot be specifically enforced; (2) finding the Husains had a likelihood of success on the merits of their contract claim; and (3) assessing the balance of harms to the two parties from erroneously granting or denying interim relief.

A. *Standard of Review*

■ In determining whether to issue a preliminary injunction, the trial court considers two related factors: (1) the likelihood the plaintiff will prevail on the merits of its case at trial, and (2) the interim harm the plaintiff is likely to sustain if the injunction is denied as compared to the harm the defendant is

likely to suffer if the court grants a preliminary injunction. (*King v. Meese* (1987) 43 Cal.3d 1217, 1226 [240 Cal.Rptr. 829, 743 P.2d 889].) "The latter factor involves consideration of such things as the inadequacy of other remedies, the degree of irreparable harm, and the necessity of preserving the status quo." (*Abrams v. St. John's Hospital & Health Center* (1994) 25 Cal.App.4th 628, 636 [30 Cal.Rptr.2d 603].)

The scope of our inquiry on appeal from an order granting a preliminary injunction is narrow. (*People ex rel. Gallo v. Acuna* (1997) 14 Cal.4th 1090, 1109 [60 Cal.Rptr.2d 277, 929 P.2d 596].) The determination whether to grant a preliminary injunction generally rests in the sound discretion of the trial court. (*Abrams v. St. John's Hospital & Health Center, supra*, 25 Cal.App.4th at p. 636.) We do not interfere absent a clear showing the trial court's discretion has been abused. (*Brunzell Constr. Co. v. Harrah's Club* (1967) 253 Cal.App.2d 764, 773–774 [62 Cal.Rptr. 505].)

"Discretion is abused when a court exceeds the bounds of reason or contravenes *uncontradicted* evidence." (*Jessen v. Keystone Savings & Loan Assn.* (1983) 142 Cal.App.3d 454, 458 [191 Cal.Rptr. 104], italics added.) "In determining the validity of [an] injunction, we look at the evidence presented to the trial court to determine if there was substantial support for the trial court's determination that the plaintiff was entitled to the relief granted. If there is, then the trial court properly exercised its discretion. *Where the evidence is conflicting, we do not reweigh it . . . .*" (*Monogram Industries, Inc. v. Sar Industries, Inc.* (1976) 64 Cal.App.3d 692, 703 [134 Cal.Rptr. 714], italics added.) However, to the extent the ruling presents an issue of pure law not presenting factual issues, we review the determination de novo. (See *Efstratis v. First Northern Bank* (1997) 59 Cal.App.4th 667, 671–672 [69 Cal.Rptr.2d 445].)

## B. *Specific Performance of Franchise Agreements*

Relying principally on *Woolley v. Embassy Suites, Inc.* (1991) 227 Cal.App.3d 1520 [278 Cal.Rptr. 719] (*Woolley*), McDonald's argues its franchise agreements with restaurant operators are, in essence, contracts for the personal services of the franchisee not subject, as a matter of law, to the remedy of specific enforcement by either party in the event of a breach. It emphasizes language in its franchise agreements to the effect that the maintenance of a "close personal working relationship" with McDonald's is "the essence" of the franchise.

The plaintiffs in *Woolley* owned 22 hotels throughout the United States that were franchised to Embassy Suites (Embassy). (*Woolley, supra*, 227 Cal.App.3d at p. 1525.) Embassy also managed 17 of the hotels for the

plaintiffs under 17 individual management agreements pursuant to which the owner had the right to terminate the manager on certain conditions. (*Ibid.*) The plaintiffs filed suit against Embassy, alleging material breach of the management agreements and seeking, among other things, a judicial declaration the agreements could be terminated. (*Ibid.*) Embassy sought and obtained a preliminary injunction enjoining the plaintiffs from terminating or attempting to terminate any of the management agreements, and the plaintiffs appealed. (*Id.* at pp. 1525–1526.) There was no dispute regarding the Embassy franchise agreements. (*Id.* at p. 1525, fn. 1.)

■ The Court of Appeal reversed the preliminary injunction order on several grounds, including the principle that an injunction cannot be granted to prevent the breach of a personal services contract. (*Woolley, supra,* 227 Cal.App.3d at pp. 1526–1535.) The court found the management agreements at issue called for the " 'rendition of a performance that is of a distinctly personal and non-delegable character . . . . [in the same category as] the contracts of actors and artists, managers, sales agents, school-teachers, mechanics, cooks, and contracts for the furnishing of personal care and support.' " (*Id.* at p. 1534, italics omitted, quoting 5A Corbin on Contracts (1964) § 1204, p. 398; see also Civ. Code, § 3390 [obligations to render personal service or employ another in personal service cannot be specifically enforced].) The appellate court reasoned the management agreements entrusted Embassy with such wide-ranging, complex, discretionary decision-making, and required such special skill and judgment on Embassy's part, they could only be considered contracts for the rendition of personal service by Embassy: "The manager's duties include: hiring and firing managerial personnel and hundreds of other employees, contracting for utility services, landscaping, maintenance and security, processing reservations, arranging for advertising and promotion, and filing legal actions on the owner's behalf to collect rent charges, cancel leases or dispossess guests. In other words, the contracts call for a series of complex and delicate business decisions and require mutual cooperation and trust, both of which have ceased to exist in the wake of rancorous litigation between the parties." (*Woolley,* at p. 1534.)

In our view, *Woolley* is distinguishable. The court in *Woolley* emphasized the discretionary nature of the decisionmaking authority held by Embassy and the complexity and delicacy of the business decisions entrusted to it. It found the services required to be as " 'distinctly personal and non-delegable' " as the services of an actor or artist. (*Woolley, supra,* 227 Cal.App.3d at p. 1534.) In other words, the court found the contract in issue was for "personal services" because management of the hotels *by Embassy and no other* was central to the contract. The Husains' franchise and licensing agreements with McDonald's were of a completely different and opposite character.

The form license agreement between McDonald's and the Husains for the Novato restaurant explains the essence of the "McDonald's System" is to ensure comprehensive control by McDonald's over every material aspect of the restaurant's operations so the uniformity of the McDonald's customer experience could be assured in every one of its locations: "The McDonald's System is a comprehensive restaurant system for the retailing of a limited menu of uniform and quality food products, emphasizing prompt and courteous service in a clean, wholesome atmosphere . . . . The foundation of the McDonald's System and *the essence of this License is adherence by Licensee to standards and policies of Licensor providing for the uniform operation of all McDonald's restaurants . . . including, but not limited to, serving only designated food and beverage products; the use of only prescribed equipment and building layout and designs; strict adherence to designated food and beverage specifications and to Licensor's prescribed standards of Quality, Service and Cleanliness . . . .*" (Italics added.) The license agreement requires the Husains to comply with all business policies, practices, and procedures imposed by McDonald's, serve only those food and beverage products McDonald's designates, maintain the building, equipment, and parking area in compliance with standards designated by McDonald's, and purchase fixtures, lighting and other equipment, seating, and signs in accordance with McDonald's designated standards. McDonald's also dictates the restaurant hours, the uniforms worn by employees, all containers and paper products used, and all food and beverage flavorings and ingredients.

In *In re Sunrise Restaurants, Inc.* (Bankr. M.D.Fla. 1991) 135 B.R. 149, the court analyzed whether a form of franchise agreement indistinguishable from that used by McDonald's was a "personal service" contract. In that case, a bankruptcy debtor who owned four Burger King restaurants sought to sell the restaurants and associated franchise agreements, along with other assets, in order to pay off creditors. (*Id.* at p. 150.) Burger King opposed the sale and contended its franchise agreements with the debtor could not be assigned under the Bankruptcy Code because they were contracts for personal services. (*In re Sunrise Restaurants, Inc.*, at pp. 152–153.) The court rejected Burger King's position: "There is hardly any question that [the] relationship between parties was nothing more than a strict business transaction to furnish economic gains to both contracting parties. To run a Burger King retail establishment does not require a special knowledge in a conventional sense, that is a special judgment, taste, skill or ability. The entire franchise operation is based on the strict rules and conditions imposed by the contract, and no retail operator is permitted to utilize his own independent culinary skills to cook hamburgers or to serve any other food items which are not generally served in Burger King establishments according to their standard. This being the case, the objection by [Burger King] [to] the Debtor's right to assume or

assign the franchise agreements and other contractual rights is without merit and must be rejected." (*Id.* at p. 153.)

■ Applying California law, the court in *In re Health Plan of the Redwoods* (Bankr. N.D.Cal. 2002) 286 B.R. 407 (*Health Plan*), found a physician group's contract with a bankrupt HMO to provide medical services to its members was not a personal service contract under California law because it did not involve a personal relation of confidence between the parties or rely on the character and personal ability of a party—a test it derived from *Coykendall v. Jackson* (1936) 17 Cal.App.2d 729 [62 P.2d 746]. (*Health Plan*, at p. 409.) "In order to be considered a personal service contract, there must be a special relationship between the parties or the party to perform must possess special knowledge or a unique skill, *such that no performance save that of the contracting party could . . . meet the obligations of the contract.*" (*Ibid.*, italics added.) The court stated: "While a contract for a physician's services might have been considered ipso facto a personal service contract 50 or 100 years ago, everything about these contracts and the nature of modern medical care militates against a finding that the contracts in question here are personal service contracts. Absolutely nothing . . . supports a finding that the contracts or the services to be rendered under them are sui generis. All of the physician contracts are essentially identical, and do not require the physicians to perform personally. They only require that the physician provide services to members, and require physicians to make 'arrangements to assure care of his/her Member patients after hours or when Physician is otherwise absent, consistent with Health Plan's administrative requirements.' " (*Id.* at pp. 409–410.)

A "close personal working relationship" does not automatically equate to personal services as defined by law. That depends on the nature and substance of the relationship. Here, the Husains are not providing personal services *to McDonald's* except in the limited sense that they are expected to work in the business rather than be passive investors. Although they *are* providing their services *to McDonald's customers,* they do so in a manner McDonald's strictly controls. From the perspective of McDonald's, the Husains are primarily providing a flow of income to the corporation. That is wholly unlike the management agreement at issue in *Woolley.* The plaintiffs in *Woolley* paid Embassy consideration to make a myriad of complex managerial decisions directly impacting the value of and return on the plaintiffs' very sizeable hotel investments. Here, McDonald's is not paying the Husains in order to benefit from their special skills, taste, or managerial judgment, but has granted them a franchise based on their willingness and ability to faithfully carry out the McDonald's System and secure for McDonald's the target flow of revenues it expects to achieve from the franchised locations.

McDonald's relies on its right to control the Husains' performance, not on their special tastes or abilities.[5]

McDonald's tacitly acknowledges its franchise agreements are not personal service contracts by arguing in another context that there is a "very robust market" for the sale of McDonald's franchises, and the Husains could have easily sold the franchises to an approved purchaser just as the Magruders had done. In that light, and considering that all of McDonald's franchise and licensing agreements with its many thousands of franchisees are standardized, and comprehensively dictate the terms of each franchisee's performance, it can hardly be said "no performance save that of [the Husains] could . . . meet the obligations of the contract." (*Health Plan, supra,* 286 B.R. at p. 409.)

We recognize some cases applying Florida law as set forth in *Burger Chef Systems, Inc. v. Burger Chef of Florida, Inc.* (Fla.Dist.Ct.App. 1975) 317 So.2d 795 (*Burger Chef*) have held franchise agreements are not subject to specific performance as a matter of law. (See, e.g., *Burger King Corp. v. E-Z Eating 8th Corp.* (S.D.Fla., Feb. 11, 2008, No. 07-20181-CIV) 2008 WL 384554; *Burger King Corp. v. Weaver* (S.D.Fla. 1992) 798 F.Supp. 684.) However the seminal decision, *Burger Chef,* involved a permanent injunction, not an interim injunction pendente lite. (317 So.2d at p. 796.) The *Burger Chef* court did not suggest the same rule would apply to interim injunctive relief and, in fact, cited with apparent favor two decisions upholding temporary injunctions against the termination of franchises until the merits of the dispute could be decided. (*Id.* at p. 797, fn. 2, citing *Bateman v. Ford Motor Co.* (3d Cir. 1962) 302 F.2d 63 and *Semmes Motors, Inc. v. Ford Motor Co.* (2d Cir. 1970) 429 F.2d 1197.) In any event, we do not find *Burger Chef* and the cases relying on it persuasive. The *Burger Chef* opinion is devoid of any analysis supporting its per se rule that no contract involving an element of personal service, including franchise agreements, can be subject to specific performance.[6]

---

[5] *Thayer Plymouth Center, Inc. v. Chrysler Motors Corp.* (1967) 255 Cal.App.2d 300 [63 Cal.Rptr. 148], also relied upon by McDonald's, is similarly unpersuasive. According to Witkin, *Thayer* exemplifies the "archaic doctrine" that contracts requiring court supervision must be denied specific performance, which has been superseded by modern case law recognizing that specific performance is available whenever it is practically feasible. (13 Witkin, Summary of Cal. Law (10th ed. 2005) Equity, § 45, p. 337; accord, *GHK Associates v. Mayer Group, Inc.* (1990) 224 Cal.App.3d 856, 880 [274 Cal.Rptr. 168].) *Long Beach Drug Co. v. United Drug Co.* (1939) 13 Cal.2d 158 [89 P.2d 386], also cited by McDonald's, is rooted in the same archaic principle. (*Id.* at p. 171.)

[6] We also note that *Burger Chef* involved a dealership agreement for the distribution of Burger King equipment and supplies, not a restaurant franchise agreement. (*Burger Chef, supra,* 317 So.2d at p. 797, fn. 1.)

██ We therefore reject McDonald's contention that the injunction violates California law and policy regarding the availability of specific performance.

C., D.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## III. DISPOSITION

The trial court's December 20, 2010 and February 16, 2011 orders are affirmed.

Marchiano, P. J., and Dondero, J., concurred.

---

*See footnote, *ante*, page 860.