Filed 3/23/21  Gerritsen v. Gerritsen CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| GREGORY GERRITSEN, | B300712 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BP152429) |
| v. | |
| ALFONSO GERRITSEN, as Trustee, etc., | |
| Defendant and Respondent. | |

APPEAL from an order of the Superior Court of Los Angeles County, Clifford Klein, Judge.  Affirmed.

Musick, Peeler & Garrett, Richard S. Conn and Cheryl A. Orr for Plaintiff and Appellant.

Hart, Mieras & Morris, Tulane M. Peterson and Gary W. Morris for Defendant and Respondent.

———————————

This appeal arises from a dispute between two brothers, appellant Gregory Gerritsen and respondent Alfonso Gerritsen, relating to their respective percentages of ownership in Gerritsen Enterprises (the Business) following the death of their mother, Margarita Gerritsen. Margarita was the founder of the Business. Her third child, Yoloxochilt Gerritsen, is not a party to the appeal. For ease of reference, we will refer to the family members by their first names.

In a statement of decision filed June 24, 2019, the probate court found that at the time of Margarita's death, the Margarita Gerritsen Living Trust dated August 19, 1998, as amended on April 26, 2006, and July 8, 2011 (the Trust), owned 49 percent of the Business; Alfonso owned 48 percent; and Gregory owned 3 percent. Gregory argues this finding is not supported by substantial evidence. He contends the probate court erred in admitting certain testimony and documents at variance with the terms of the Business's partnership agreement; failed to apply case law that would have required equal division of the Business between Alfonso and Gregory; and failed to find the Business was a sole proprietorship, owned 100 percent by the Trust.

We find no error, and therefore, we affirm.

## BACKGROUND

### A. The Issue Before the Probate Court

Margarita died on May 17, 2013. On May 30, 2014, Gregory filed a petition in probate court to compel Alfonso, as trustee of the Trust, to account, initiating this matter. On October 3, 2014, Alfonso petitioned the probate court to determine, among other things, "the rightful owners and percentages of ownership of [the Business]." Alfonso argued that as reflected in the Business's tax returns, Schedule K-1 filings, at

2

the time of Margarita's death, the Business was owned 49 percent by the Trust, 48 percent by Alfonso, and 3 percent by Gregory. According to Alfonso, based on a provision in the second amendment to the Trust that bequeathed half of the Trust's interest each to Alfonso and Gregory, following Margarita's death, Alfonso owned 72.5 percent of the Business, and Gregory owned 27.5 percent.

On October 25, 2018, Gregory filed a petition in which he sought to have the probate court confirm that he was a 50 percent owner of the Business. He maintained that Margarita transferred her 100 percent interest in the Business to the Trust. Accordingly, when Margarita died, he and Alfonso each owned a 50 percent share in the Business.

We summarize the evidence presented at trial below.

## B. The Partnership Agreement

On July 1, 1985, Margarita, Alfonso, and Yoloxochilt entered into a general partnership agreement forming the Business for the purpose of "engag[ing] in the business of Shaklee," which involved the distribution of products such as vitamins, face creams, and dietary supplements. According to the partnership agreement, Margarita "shall be the majority owner and managing partner of the partnership. She shall initially contribute to the partnership as capital the amount of $3,000.00 in cash."

As to Alfonso's and Yoloxochilt's capital contributions, the partnership agreement stated that they each "shall be a partner, but shall not make any contribution in cash or property to the initial capital of the partnership, and no amount shall be contributed initially to his [or her] capital account. He [or she] shall subsequently contribute services to the partnership, and his

3

[or her] capital account shall be credited no more than 2 [percent] of the partnership capital account. This credit to the capital account shall be in the sole discretion of the managing partner, [Margarita]."

Further, "[t]he partnership's profits and losses shall be shared by the partners in the same proportions as their initial capital accounts bear to each other. . . . [¶] Distribution of profits shall be in the sole discretion of the majority and managing partner, [Margarita]."

As to Gregory, the agreement stated, "It is expressly acknowledged and understood that all the partners agree to admit the minor [Gregory], born [1975], into the partnership on his 18th birthday. If the managing partner is still alive, she in her sole discretion shall determine said [Gregory]'s initial interest in the partnership." The agreement included an integration clause and required modifications to be in writing and "signed by the party to be charged."

The parties do not dispute that under the partnership agreement, Margarita had complete authority over the allocation of the Business's profits among the partners and that the capital account balances were to have no effect on the allocation of profits.

C.    **Amendments to the Partnership Agreement and the Trust**

In 1993, Gregory became a partner in the Business. Although a document was prepared to reflect his entry into the partnership, no copy was retained. Gregory understood that Margarita "had all the power, it was her business[,] and [they] all abided by that." He also understood that "the partnership agreement itself allowed for allocation of profits without respect

4

to capital account balances or actual ownership of the Business, and irrevocably vested in Margarita the power to allocate profits on an annual basis."

Upon his admission into the partnership, Gregory worked for the Business part time. He "answer[ed] phones, ma[d]e orders, [and] accompan[ied his] mother to meetings and demonstrations." In 2011, when Margarita became ill, he helped organize business meetings.

On August 19, 1998, Margarita created the Trust. It required that upon her death, 50 percent of her interest in the Business would be allocated to Yoloxochilt; and 25 percent each would be allocated to Alfonso and Gregory. Margarita executed an assignment of her partnership interest to the Trust, which stated, "Assignor hereby assigns all of her right, title and interest as a general partner of [the Business], a general partnership, including ___ [blank to be filled in] percent interest in and to the profits, losses and distributions of said partnership." The assignment was signed by Margarita and her children, without the blank space filled in. On October 15, 1998, the estate planning firm returned the document to Margarita with a request that she fill in the blank. She handwrote "100" in the blank space.

On January 30, 2004, Margarita, Alfonso, Gregory, and Yoloxochilt signed a writing that purported to reflect an agreement reached in September 2003 under which Yoloxochilt separated from the partnership. The 2003 Schedule K-1 for the Business indicated Yoloxochilt's ownership interest was 35 percent. Gregory testified that none of the partners discussed the fact that Yoloxochilt was entitled to receive 35 percent of the value of the Business. In contrast, Alfonso testified that

5

Yoloxochilt received an amount equal to 35 percent of the Business, "[a]nd then some," in the form of $50,000 and a car worth approximately $50,000.

Margarita became ill with cancer in 2011. In May 2011, she created typewritten notes in Spanish proposing changes to the distribution of the Trust assets. Two English translations of the notes were presented to the probate court. One translation stated that "Gregory is the ½ owner of the [Business] after its costs, promotions and taxes." The second translation stated that "Gregory will receive ½ the profits from the [Business]." However, the second English version was modified by a handwritten insertion to read, "Gregory will receive ½ *of my ownership interest in* the profits from the [Business.]"

Margarita's estate planning attorney, Gary Morris, met with Margarita concerning the proposed changes, which would culminate in the second amendment to her Trust. He testified that Margarita told him she had a 49 percent ownership interest in the Business and that she had given 48 percent to Alfonso. Morris understood that Margarita made transfers of ownership in the Business to her children to reflect the value of the work they did. The second amendment did not expressly state that Margarita's interest was 49 percent because Morris assumed this could change again.

Lisa Peterson used to work at the same firm as Morris. Peterson was not present at the meeting with Margarita, but recognized the handwritten phrase "of my ownership interest in" on the second English translation as her own handwriting. She did not remember making the handwritten notation. However, because the notation did not include Morris's initials after it, she believed that she added the phrase on her own, and not pursuant

6

to instructions from Morris. She did not know whether Margarita owned less than 100 percent of the Business; Peterson included the phrase because it provided greater specificity.

On July 8, 2011, Margarita executed the second amendment to the Trust. It states that "[o]ne-half (1/2) of Trustor's ownership interest in the [Business] shall be distributed to [Gregory]. . . . Should [Gregory] . . . decide not to work next to [Alfonso], it is Trustor's desire that [Gregory] . . . receive only twenty percent (20%) of the monthly profits. If [Gregory] should decide to sell, transfer or exchange his interest in the [Business], it is Trustor's desire that [Alfonso] shall have the right of first refusal to purchase such interest." Further, "[o]ne-half (1/2) of Trustor's ownership interest in the [Business] shall be distributed to [Alfonso]."

## D. The Business's Tax Returns

### 1. *Schedule K-1 for Tax Years 2000-2013*

The Business's partnership tax returns for the years 2000 through 2013 each indicated that the Business was a general partnership. The percentage of profits, losses, and ownership capital reflected in box J[1] of the Schedule K-1s for each partner, were as follows:

---

[1] The format of the Schedule K-1s provided to the probate court changed in 2004. Between 2000 and 2003, the box referred to here as box J was identified as box D.

7

| Year | Margarita | Yoloxochilt | Alfonso | Gregory |
|------|-----------|-------------|---------|---------|
| 2000 | 45 | 35 | 15 | 5 |
| 2001 | 40 | 35 | 20 | 5 |
| 2002 | 35 | 35 | 20 | 10 |
| 2003 | 35 | 35 | 20 | 10 |
| 2004 | 45 | 0 | 35 | 25 |
| 2005 | 45 | 0 | 35 | 25 |
| 2006 | 45 | 0 | 35 | 25 |
| 2007 | 45 | 0 | 35 | 20 |
| 2008 | 45 | 0 | 35 | 20 |
| 2009 | 48 | 0 | 46 | 6 |
| 2010 | 49 | 0 | 48 | 3 |
| 2011 | 49 | 0 | 48 | 3 |
| 2012 | 49 | 0 | 48 | 3 |
| 2013 | 49 | 0 | 48 | 3 |

The IRS instructions for partnership returns state that as to box J, "[o]n the line for *Capital*, enter the percentage share of the capital that the partner would receive if the partnership was liquidated by the distribution of undivided interests in partnership assets and liabilities. If the partner's capital account is negative or zero, express the percentage ownership of capital as zero."

2. *Gregory's Evidence*

In 2008, Gregory advised his mother that he wanted the amounts reported on the Business's tax returns to be "honest" and that what was being reported for him was "too high" compared to what he was receiving. Thus, on the 2009 tax return, his percentage of profits, losses and ownership of capital

dropped from 20 percent to 6 percent, and in 2010 and the following years, it was reduced to 3 percent.

As a witness for Gregory, Yoloxochilt testified that while she was a partner, she oversaw the preparation of the Business's tax returns. Although tax documents stated she previously received 35 percent of the Business's profits, she denied that she was a 35 percent owner. Rather, Margarita controlled the business and "could give out income or capital and withdraw it as she saw fit." Yoloxochilt testified that she felt that neither she, Alfonso, nor Gregory were owners of the Business. However, in verified filings with the probate court, Yoloxochilt stated that Gregory and Alfonso "previously . . . were part owners of the [B]usiness."

3. *Alfonso's Evidence*

Alfonso testified that the percentages listed on the tax returns each year determined the profit share of the partners for the following year. He had multiple discussions with Margarita relating to the tax documents, in which she indicated that Gregory was only a 3 percent partner because he was not working in the Business. In contrast, Alfonso was given 48 percent because of the extensive work he performed for the Business. Alfonso testified that he never heard his mother discuss the concept of non-equity partners and always believed himself to be a general partner in the Business.

Accountant Melinda Estrada's firm had provided accounting services for the Business for approximately 30 years. Margarita told Estrada that Gregory's percentage ownership was 3 percent.

9

### 4. *Accounting Experts*

Gregory's accounting expert, Brian Shapiro, testified that the Business's tax returns from 2000 to 2013 were not prepared in a manner consistent with tax reporting requirements. For example, the tax returns failed to report cash, included balance sheets that were not balanced, intermittently reported a capital account balance, and never reported cash disbursements. He stated that, "just because you stick a capital account number on a Schedule K-1 doesn't make it so." He also observed that for the years 2004 through 2007, the total percentage of ownership reported on the Schedule K-1s totaled 105 percent. Shapiro opined that Margarita's distribution of income, "ha[d] nothing to do with capital. Capital in a partnership is defined by what's in the operating agreement. And for capital to change in a partnership . . . either the equity has to be sold or . . . gifted. . . . If someone is suggesting that you look at a [Schedule] K-1 and whatever that [Schedule] K-1 says must be the way it is, . . . then we got some real problems . . . because there is nothing on those [Schedule K-1s] that is consistent with not only the prior year but with . . . how the rules suggest that it is supposed to be reported."

Anne Hayes, the certified public accountant retained by the temporary trustee, Jeffrey Siegel, agreed there were several problems with the tax returns. She had "no way of knowing with certainty whether [the percentage allocations reflected in the 2010 to 2013 returns] were accurate or reliable. But based on . . . the partnership agreement, which indicated that Margarita retained 100 percent interest of the capital, of the equity interest, and that no other partner was to receive more than 2 percent of the equity, [she] found it difficult to understand how equity would have been distributed to any of the other partners[.]"

10

According to Hayes, a partner could have unequal income interests and equity interests in a partnership, such as a nonequity partner in a law firm. Based upon her review of the partnership agreement and tax returns as well as her conversations with Gregory, Yoloxochilt, and Siegel, Hayes concluded that the most prudent course of action for the 2017 tax return was to report that the Trust owned 100 percent of the Business.

Alfonso's accounting expert, Donald Berkheimer, testified that the phrase "capital" on the tax returns refers to ownership. He opined that capital account balances on the tax returns did not have to correspond with profit shares given to individual partners. He acknowledged the partnership agreement provided that no one other than Margarita could have more than 2 percent credited to their capital account, but he concluded "there must have been changes that weren't documented." He opined Margarita did not own 100 percent of the Business in 1998, observing that if Margarita had in fact transferred 100 percent of the Business to her Trust on October 10, 1998, then it would have been unnecessary to remove Yoloxochilt from the partnership in 2003. He also testified that for tax return purposes, it was not possible to have a partnership with only one owner, which would constitute a sole proprietorship.

### E. Events After Margarita's Death

After Margarita's death, Alfonso, Gregory, and Yoloxochilt met at Morris's office to discuss the second amendment to the Trust. During the meeting, Morris explained that until the Trust was administered, Gregory did not have any right to control the portion of the Business that was held by the Trust. Yoloxochilt and Gregory disagreed, telling Morris that Gregory was a

11

partner.  Both Yoloxochilt and Gregory testified that during the meeting, Gregory pointed Morris to the tax returns as evidence of his partnership.

Thereafter, Gregory sent a letter to Morris reasserting that he was a partner in the Business, "exclusive of the [T]rust."  To prove he was a partner, he appended documents to the letter, including a fictious business name statement created on or prior to August 28, 2008, which listed Gregory as an owner.

## F.    The Probate Court's Findings

On June 24, 2019, following seven days of trial, the probate court issued a 17-page statement of decision.  The probate court observed that, "[t]he resolution of this issue [concerning the percentages of ownership] is an especially difficult one for the court due to credibility issues with prior conduct by both brothers, and the absence of any reliable documentary corroboration for their respective positions.  The court . . . examined the evidence in its effort to determine the intent of . . . Margarita . . . with the distribution of her interest in [the Business].  The court finds by a preponderance of the evidence that she did not transfer 100 percent of the ownership of [the Business] into her [T]rust . . . ."  Consistent with the 2010, 2011, and 2012 tax returns, the court concluded that at the time of Margarita's death, the Trust owned 49 percent of the Business, Alfonso owned 48 percent, and Gregory owned the remaining 3 percent.

Gregory timely appealed.

### DISCUSSION

We review the probate court's express and implied findings of fact in its statement of decision for substantial evidence.

12

(*Ermoian v. Desert Hospital* (2007) 152 Cal.App.4th 475, 501.) "Under the substantial evidence standard of review, our review begins and ends with the determination as to whether, on the entire record, there is substantial evidence, contradicted or uncontradicted, which will support the trial court's factual determinations. [Citations.] Substantial evidence is evidence of ponderable legal significance, reasonable in nature, credible, and of solid value. [Citation.]" (*Ibid*.) In reviewing the sufficiency of evidence, we also view all factual determinations in the light most favorable to the prevailing party and in support of the judgment. (*Nestle v. City of Santa Monica* (1972) 6 Cal.3d 920, 925.) " 'In brief, the appellate court ordinarily *looks only at the evidence supporting the successful party, and disregards the contrary showing*.' [Citation.] All conflicts, therefore, must be resolved in favor of the respondent. [Citation.]" (*Id*. at pp. 925-926.)

## A.   There is No Dispute that Margarita Controlled Distribution of Profits

In support of his argument that the Trust owned 100 percent of the Business, Gregory argues that under the partnership agreement, Margarita possessed the right to 100 percent of the Business's profits.

The parties agree that under the partnership agreement, Margarita had complete authority over the allocation of the Business's profits among the partners. They also agree that the capital account balances, which reflected ownership, were separate from the allocation of profits, which could be allocated without respect to capital account balances or actual ownership of the Business. Accordingly, Margarita's control over allocation of

13

the Business profits has limited value in determining the division of ownership in the Business.

## B. Substantial Evidence Supports the Trial Court's Findings

Substantial evidence supports the probate court's conclusion that the Trust owned 49 percent of the Business. In determining the ownership interests, the probate court properly sought to determine what percentage of the Business was held by the Trust at the time of Margarita's death. The Business's 2010 and 2011 tax returns, which were filed in the years prior to her death, help to inform this determination, and indicated the Trust owned 49 percent of the Business. The Business's 2012 tax return also indicates the Trust owned 49 percent of the Business. However, the tax preparer, Estrada, executed the 2012 tax return in January 2014, eight months after Margarita passed away. Accordingly, we do not rely on the 2012 tax return in our opinion.

The ownership percentages indicated on the tax returns were corroborated by (1) Morris's testimony that in 2011, Margarita told him the Trust owned 49 percent of the Business and Alfonso owned 48 percent; (2) Estrada's testimony that Margarita told her Gregory held a 3 percent ownership interest; and (3) Alfonso's testimony that his ownership percentage was 48 percent and Gregory's was 3 percent. It is also noteworthy that the tax returns for the years 2000 to 2009 reflected a reduced ownership interest for Margarita, fluctuating between 35 to 45 percent, further supporting the inference that she owned less than 100 percent of the business when she transferred her interest to the Trust in 1998.

Gregory contends the tax returns were a sham. However, in 2008 Gregory insisted that the tax returns should more

14

accurately reflect the income he received from the Business. There is no evidence to indicate that he complained further after his share of the profits, losses, and capital account was reduced to 6 percent in 2009, and to 3 percent in 2010. Admittedly, the tax returns included miscalculations and inconsistencies. Nonetheless, due to the limited written documentation available, we cannot find the probate court erred when it concluded the tax returns provided the most reliable evidence of the Business's ownership percentages.

The language used in the Trust documents further supports the probate court's finding. Although the Trust documents do not specify the exact ownership interest held by Margarita and assigned to the Trust, both the original 1998 trust instrument and the 2011 second amendment bequeath only Margarita's "interest" in the Business. This phrase supports the inference that Margarita did not own 100 percent of the Business.

Moreover, the second amendment indicates that when it was executed in 2011, Margarita understood that Alfonso had a greater degree of participation in the Business than Gregory. It contemplates a reduction in allocation of the profits if Gregory did not work alongside Alfonso, and required that Alfonso receive a right of first refusal if Gregory chose to sell his interest in the Business. The second amendment does not include similar contingencies for Gregory's benefit.

Gregory points to the October 1998 assignment of Margarita's interest to the Trust in which she handwrote the number "100" as evidence that Margarita transferred 100 percent of the Business to the Trust. However, this document is easily susceptible to a different interpretation if Margarita owned less

than 100 percent of the Business at that time.  The inference that she did not own 100 percent is supported by the Schedule K-1s executed for tax years 2000 through 2003, in which Margarita's reported interest fluctuates between 35 to 45 percent, and Yoloxochilt's interest is reported as 35 percent.  Margarita's reduced interest also is consistent with the documentation of Yoloxochilt's withdrawal from the partnership in 2003, and her receipt of assets worth approximately $100,000.

Gregory notes the partnership agreement provided that Margarita "shall be" the majority owner in the partnership and that no other partner could have more than 2 percent of the capital attributed to their capital account.  He argues the probate court's finding fails to give effect to these provisions.  Moreover, he argues, the partnership agreement requires that any modification to its terms be made in writing and signed by the party charged.  From this language, Gregory concludes that without an executed writing evidencing a departure from these terms, Margarita never could own less than 50 percent of the Business and neither he nor Alfonso could own more than 2 percent.  We are not persuaded.

In support of this argument, Gregory cites Civil Code section 1698, which he describes as providing that a "written agreement may *only* be modified by a written agreement." (Italics added.)  To the contrary, Civil Code section 1698 does not include the word "only."  Moreover, it provides that "[n]othing in this section precludes in an appropriate case the application of rules of law concerning estoppel, oral novation and substitution of a new agreement, rescission of a written contract by an oral agreement, waiver of a provision of a written contract, or oral independent collateral contracts." (Civ. Code, § 1698, subds. (a),

16

(d).)  Appellate courts hold that a contract provision excluding modification except by a signed writing does not prevent the parties from modifying the terms of the contract by conduct antithetical or wholly inconsistent with its terms.  (See *Diamond Woodworks, Inc. v. Argonaut Ins. Co.* (2003) 109 Cal.App.4th 1020, 1038; *Biren v. Equality Emergency Medical Group, Inc.* (2002) 102 Cal.App.4th 125, 141 [" 'the parties may, by their conduct, waive such a provision' where evidence shows that was their intent"].)  Thus, implied in the probate court's ruling is a finding that the parties modified the partnership agreement through their conduct.  Gregory fails to demonstrate that the probate court's implied and express findings are not supported by substantial evidence.

## C.  The Evidence Did Not Compel the Probate Court to Find the Business Was a Sole Proprietorship

Gregory maintains the Business was a sole proprietorship or that Margarita was the sole equity partner.  This position is untenable.

A partnership "means an association of two or more persons to carry on as coowners a business for profit . . . ."  (Corp. Code, § 16101, subd. (a)(9).)  Under such conditions, except in certain circumstances not present here, a partnership is formed "whether or not the persons intend to form a partnership."  (Corp. Code, § 16202, subd. (a).)

Although Margarita's control of the Business was pervasive, this degree of control was defined in the partnership agreement and is not a sufficient basis to find the Business was a sole proprietorship.  Every document presented to the probate court identifies the Business as a general partnership.  The Schedule K-1s refer to Gregory as a general partner.  Indeed,

17

Gregory vociferously insisted to Morris, following Margarita's death, that he was an existing partner in the Business, exclusive of the Trust, and pointed to both the tax returns and other government filings to support his position.[2] Yoloxochilt also identified Gregory as an "owner" in the Business in her probate court filings. Gregory notes that under the terms of the partnership agreement, neither he nor Alfonso contributed capital to the Business. However, the agreement contemplated that Alfonso's capital account would be credited based on his contribution of service.

In light of Gregory's prior actions and the dearth of documentary evidence demonstrating the Business was a sole proprietorship or non-equity partnership, the probate court properly rejected Gregory's argument.

## D.    The Probate Court Did Not Admit Evidence in Contravention of the Parol Evidence Rule

Gregory maintains the probate court violated the parol evidence rule in admitting certain evidence that was inconsistent with the partnership agreement. Specifically, he challenges the admission of (1) Morris's testimony that in 2011, Margarita told him that she owned 49 percent of the Business; (2) Alfonso's testimony that his ownership percentage was 48 percent; (3) Berkheimer's opinion that in 1998, when Margarita transferred her interest in the Business to the Trust, she did not own 100 percent of the Business; and (4) the Business's tax returns. Alfonso responds that Gregory also presented parol

---

[2] We note that his insistence in 2013 that he was a partner contradicts his contention in the litigation that the Trust owns 100 percent of the Business.

18

evidence when he testified that in 1993, he signed an agreement admitting him into the partnership, which he could not produce to the court. Both parties misapprehend the parol evidence rule, which is inapplicable here.

The parol evidence rule "is founded on the principle that when the parties put all the terms of their agreement in writing, the writing itself becomes the agreement. The written terms supersede statements made during the negotiations." (*Riverisland Cold Storage, Inc. v. Fresno-Madera Production Credit Assn.* (2013) 55 Cal.4th 1169, 1174.) Thus, "[t]he parol evidence rule will exclude evidence of a prior or contemporaneous agreement that contradicts the terms of an integrated writing." (*Take Me Home Rescue v. Luri* (2012) 208 Cal.App.4th 1342, 1351; see Civ. Code, § 1625 ["The execution of a contract in writing . . . supersedes all the negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument"]; Code Civ. Proc., § 1856, subd. (a) ["Terms set forth in a writing intended by the parties as a final expression of their agreement with respect to the terms included therein may not be contradicted by evidence of a prior agreement or of a contemporaneous oral agreement"].) The rule does not prohibit evidence of conduct subsequent to the execution of the agreement.[3] (*Charnay v. Cobert* (2006) 145 Cal.App.4th 170, 186.)

---

[3] Gregory further argues that Morris could not offer testimony contradicting the terms of the 1998 assignment of partnership interest. This document does not contain an integration clause, and Gregory does not develop any argument that this document was a final, unambiguous agreement between

19

**E.      The Probate Court Did Not Err by Admitting Testimony That Was Biased or Speculative**

Gregory objects to the testimony by Alfonso and Morris on the ground they were biased.  Any bias, however, goes to the weight, not the admissibility, of their testimony.  (See Evid. Code, § 780, subd. (f) ["the court or jury may consider in determining the credibility of a witness any matter that has any tendency in reason to prove or disprove the truthfulness of his testimony at the hearing, including but not limited to" "the existence or nonexistence of a bias, interest, or other motive"]; *Vorse v. Sarasy* (1997) 53 Cal.App.4th 998, 1001, 1009 [under all but the most limited circumstances, witness credibility is a question of fact to be resolved by the trier of fact].)  The probate court did not err in declining to exclude their testimony on this basis.

Gregory also argues that Morris's testimony was speculative because he did not have personal knowledge of the percentage of the Business owned by Margarita in 1998 when she transferred her interest to the Trust, nor was he familiar with the partnership agreement.  Morris's lack of knowledge in these areas has no bearing on his testimony that in 2011, when he met with Margarita to discuss amendments to her Trust, Margarita told him she owned 49 percent of the Business.  Further, his testimony that in 1998 she "transferr[ed] 100 percent of her interest" in the Business to the Trust was premised on the language in the 1998 assignment of partnership interest, and therefore it was not speculative.

---

the signatories.  Therefore, we decline to apply the parol evidence rule to Morris's testimony concerning the 1998 assignment of partnership interest.

20

Gregory contends Berkheimer's testimony was speculative. Berkheimer testified as an expert in accounting, explaining certain tax preparation issues, including the significance of a partner's capital percentage and the entries inserted on the Schedule K-1 by the tax preparer. His opinion that Margarita did not own 100 percent of the Business in 1998 was based on his analysis of the records submitted for his review. Berkheimer's statements were grounded in his expertise as a certified public accountant, and were not speculative.

## F.    *Han v. Hallberg* Does Not Require a Different Result

Gregory argues the trial court erred in refusing to recognize the Trust was the assignee of Margarita's partnership interest pursuant to *Han v. Hallberg* (2019) 35 Cal.App.5th 621.[4] To the contrary, the probate court expressly found Margarita transferred her 49 percent interest in the Business to the Trust. Accordingly, the holding in *Han* does not have a bearing on the issues raised on appeal.

---

[4] In *Han*, the appellate court concluded that a trust "is a person that may associate with other persons in a partnership." (*Han v. Hallberg, supra,* 35 Cal.App.5th at p. 637.)

## DISPOSITION

The order of the probate court as set forth in the statement of decision filed June 24, 2019, is affirmed.  Alfonso is to recover his costs on appeal.

NOT TO BE PUBLISHED

FEDERMAN, J.*

We concur:

CHANEY, J.

BENDIX, Acting P. J.

---

* Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.