[No. B229486. Second Dist., Div. One. Aug. 29, 2012.]

TAKE ME HOME RESCUE, Plaintiff and Respondent, v.
ERIKA LURI, Defendant and Appellant.

**COUNSEL**

Erika Luri, in pro. per.; and Paul Kujawsky for Defendant and Appellant.

The Macellaro Firm, Theresa J. Macellaro, Teresa L. Huggins and Vanessa Rownaghi for Plaintiff and Respondent.

**OPINION**

**JOHNSON, J.**—Defendant Erika Luri appeals from an injunction requiring her to return a rescue dog, for which she was providing foster care, to a rescue organization because Luri failed to have the dog spayed. Luri contends that (1) the written foster care agreement did not require her to have the dog spayed and (2) Los Angeles Municipal Code section 53.15.2, subdivision (b)(2)(B) grants her an exemption from the spaying requirement of Food and Agriculture Code section 30503, subdivision (a) that requires shelters to spay dogs before putting them up for adoption. We affirm.

### FACTUAL BACKGROUND AND PROCEDURAL HISTORY

#### 1. *Factual Background*

Take Me Home Rescue is a nonprofit organization composed of volunteers that partners with local animal shelters to adopt animals, provide them with food and veterinary care, and find them permanent homes. The spaying and neutering of such shelter animals is part of Take Me Home's mission to

reduce the pet overpopulation problem, and is required by Food and Agriculture Code section 30503, subdivision (a)(1).[1]

On July 6, 2009, Take Me Home adopted a deaf white-and-black female boxer dog from the Orange County Animal Care services. The dog was known as "Lilly."[2] Lilly was a "rescue only dog," meaning that she could not be adopted directly from the shelter. At the time, Lilly was diagnosed with demodex (demodectic mange), and due to that condition, was not deemed to be suitable for spaying until her health improved. Take Me Home contractually agreed with Orange County Animal Care services to have Lilly spayed before placing her in a permanent home. When caring for an animal that is not well enough to be spayed or neutered, Take Me Home will place the pet in a foster home until such time as the animal's health improves and the pet can be spayed or neutered.

On July 15, 2009, Lilly was placed in temporary foster care with defendant Luri. Luri had found Lilly on Take Me Home's Web site, which states that "[a]ll of our animals are spayed or neutered, brought up-to-date on all shots and are micro-chipped." Sarah Ciscil of Take Me Home explained to Luri that Lilly could not be placed for adoption until she was spayed. Luri agreed that Lilly would be spayed as soon as she was healthy enough. Luri signed Take Me Home's temporary foster care agreement. The foster care agreement does not require Luri to spay Lilly, but instead specifies instructions for the dog's care.

Luri claimed that at no time during her conversation with Take Me Home prior to her assuming foster care of Lilly did anyone on behalf of Take Me Home mention the law on spaying and neutering or Take Me Home's policy on foster dogs with respect to spaying and neutering. Luri advised Take Me Home that she did not want to be a foster home, but wanted to adopt. However, Luri was told that she had to sign the foster care agreement first if she wanted to adopt Lilly because Lilly was sick, but she was not told that Lilly had to be spayed prior to adoption or that there was a legal requirement of spaying. Luri understood that the "procedure of being called a temporary medical foster [home was] a mere formality and that [she] was in fact Lilly's permanent owner (with the right of first refusal should I change my mind after Lilly became free of mange), given that I had expressed by intent to [Take Me Home] to become the permanent owner of Lilly . . . ."

---

[1] Food and Agriculture Code section 30503, subdivision (a)(1) provides in relevant part that, "[e]xcept as otherwise provided in subdivision (b), no public animal control agency or shelter, society for the prevention of cruelty to animals shelter, humane society shelter, or rescue group shall sell or give away to a new owner any dog that has not been spayed or neutered."

[2] Luri renamed the dog "Felina."

Luri discovered that Lilly was very athletic, and because Lilly had a feline nature, she changed Lilly's name to Felina. Luri also decided to train Lilly as an agility dog, and in doing some research, Luri discovered that spaying or neutering purportedly could interfere with Lilly's agility skills. Thus, Luri applied to the City of Los Angeles for an intact license for Lilly that exempted her from spaying based upon Lilly's training as an agility dog.[3] Luri did research and discovered that not only did spaying interfere with an agility dog's training, it had negative health benefits for dogs in general, including increased risk of illnesses.

On September 7, 2009, Luri informed Shannon Haber of Take Me Home that she would not spay Lilly because Luri believed it would affect the dog's agility training. On September 10, 2009, Luri met with Shannon Haber of Take Me Home and told Haber that she wanted to keep Lilly and train her as an agility dog. Haber responded that she believed Take Me Home spayed all of its dogs, but she would speak to Take Me Home about Luri's request.

Later, Luri heard from Haze Lynn of Take Me Home, who told Luri that Lilly must be spayed because Take Me Home was a nonprofit organization. When Luri reiterated that she was getting an intact license for Lilly, and did not need a breeder's license because she was not going to breed Lilly, the phone went dead. Lynn e-mailed Luri, stating that Luri was a foster caregiver and Take Me Home wanted Lilly returned within 48 hours, and that Lynn would call animal care and the police. Several days later the police arrived at Luri's building, but she did not speak to them. On September 22, 2009, Leegie Parker from Take Me Home called Luri and threatened to call animal control and the police. This was Luri's last contact with Take Me Home.

According to Lynn, on September 15, 2009, Luri acknowledged that she had agreed to have Lilly spayed, but Luri had changed her mind because she had done some research and believed spaying the dog was mutilation. Lynn explained to Luri that state law required the dog to be spayed prior to placement in a permanent home, and that Luri had agreed to follow Take Me Home's instructions regarding care of the dog, which included spaying or returning the dog to Take Me Home.

On September 23, 2009, Take Me Home wrote to Luri and advised her she was in breach of the foster care agreement. Take Me Home advised Luri that

---

[3] Los Angeles Municipal Code section 53.15.2 generally requires dogs and cats over the age of four months to be spayed and neutered. Section 53.15.2, subdivision (b)(2)B provides an exemption if "[t]he dog has earned, or if under three years old, is actively being trained and in the process of earning, an agility, carting, herding, protection, rally, hunting, working, or other title from a registry or association approved by the Department through its [Board of Animal Services] Commission."

California law required Lilly to be spayed. Furthermore, Luri's refusal to spay Lilly was endangering the dog's health because demodectic mange was associated with a weakened immune system, and if Lilly came into heat, the stress could retrigger the mange. In addition, Lilly had displayed aggressive behavior that would be reduced by spaying.

On October 5, 2009, Luri denied she was in breach of the foster care agreement and asserted she had adopted Lilly based on the fact she had informed Take Me Home she wanted to adopt Lilly, and Luri had performed the terms of the foster care agreement.

On November 19, 2009, Luri obtained a six-month "spay deferment" for Lilly based upon Lilly's mange. However, the veterinarian issuing the spay deferment stated that Lilly could be spayed if the dog's initial veterinarian said it was safe to do so. Luri has been searching for someone to perform a tubal ligation on Lilly, and asserts that Take Me Home agreed such procedure could be used as an alternative to spaying (which removes all of the dog's reproductive organs).

In January 2010, Luri admitted to Take Me Home's attorney that she had agreed to have Lilly spayed before she signed Take Me Home's foster care agreement, but later changed her mind after researching the issue.

In April 2010, the Orange County Animal Care services sent Take Me Home a letter indicating that it had not received a sterilization certificate for Lilly and Take Me Home was in violation of Take Me Home's agreement with the shelter. Orange County Animal Care services threatened to suspend Take Me Home from its adoption program.[4] On April 27, 2010, Take Me Home sent Luri a letter asking her to have Lilly spayed.

## 2. *Procedural History*

On January 19, 2010, Take Me Home filed its complaint in this matter. On July 30, 2010, Take Me Home filed its operative first amended complaint, stating claims against Luri for breach of contract, conversion, declaratory relief, and preliminary and permanent injunction.

On August 4, 2010, Take Me Home moved for a preliminary injunction ordering Luri to perform the foster care agreement by having Lilly spayed or in the alternative returning the dog to Take Me Home. Take Me Home asserted that it would suffer irreparable harm if Luri did not return or spay

---

[4] In May or June 2010, Orange County Animal Care services agreed to await the outcome of this proceeding before taking action regarding its dealings with Take Me Home.

Lilly because unless Orange County Animal Care received proof of spaying it would suspend Take Me Home from its animal adoption program and report it to other local animal shelters so that they would also suspend Take Me Home from their adoption programs. Further, Take Me Home was likely to succeed on its breach of contract claim because the foster care agreement and the oral agreement of the parties was that Luri would care for Lilly until her mange cleared up, at which time Luri would either return Lilly to Take Me Home, or have Lilly spayed; and Take Me Home was likely to prevail on its conversion claim because pursuant to the foster care agreement, it remained the legal owner of Lilly.

Luri opposed the motion, contending that she was not in breach of the agreement because the foster care agreement contained no provision requiring her to spay Lilly, nor did state law require her to spay the dog; the only remedy on a conversion claim was money damages, not injunctive relief; and Take Me Home had not established irreparable harm because Orange County Animal Care services had only threatened to take action, not that it was going to do so. Luri submitted the declaration of Laura J. Sanborn, the author of an article entitled "Long-Term Health Risks and Benefits Associated with Spay/Neuter in Dogs," which reviewed the veterinary research literature with regard to the effects of spaying and neutering dogs.

At the hearing held October 27, 2010, Luri, who was not represented by counsel, failed to appear. The court adopted its tentative ruling, granted the injunction and set the bond at $5,000. The court ruled that in balancing the equities, Take Me Home was more likely to suffer injury from denial of the injunction than Luri would suffer if the court granted the relief requested. Further, Take Me Home had established it had a reasonable probability of prevailing on the merits of its breach of contract claim based upon the foster care agreement, and that requiring Lilly to be spayed will avoid the substantial harm that may be suffered by Take Me Home. In addition, spaying was required by law and was consistent with the obligations agreed to by Luri at the request of Take Me Home. Finally, because the court was not granting the injunction on the conversion claim, if Luri complied with the order to have Lilly spayed by a veterinarian acceptable to Take Me Home, Luri could remain in possession of Lilly until the entire matter was adjudicated or parties resolved their differences.

After the hearing, the court issued its injunction on Take Me Home's first cause of action for breach of contract, and ordered Luri to have Lilly spayed by a veterinarian acceptable to Take Me Home not later than November 17,

2010, and if Luri complied with the order, she could remain in possession of Lilly until the entire matter was adjudicated or the parties resolved their differences.[5]

## DISCUSSION

Luri contends that the foster care agreement nowhere requires her to spay Lilly; pursuant to Food and Agriculture Code section 30503, subdivisions (b) and (d), Lilly could be temporarily exempted from the statute's spay and neuter requirement; and because state regulation does not occupy the field of dog regulation, under Los Angles Municipal Code section 53.15.2, Lilly is exempt from the spaying requirement as an agility dog.

### I. *Standard of Review*

■ "In determining whether to issue a preliminary injunction, the trial court considers two related factors: (1) the likelihood that the plaintiff will prevail on the merits of its case at trial, and (2) the interim harm that the plaintiff is likely to sustain if the injunction is denied as compared to the harm that the defendant is likely to suffer if the court grants a preliminary injunction." (*14859 Moorpark Homeowner's Assn. v. VRT Corp.* (1998) 63 Cal.App.4th 1396, 1402 [74 Cal.Rptr.2d 712].) "The latter factor involves consideration of such things as the inadequacy of other remedies, the degree of irreparable harm, and the necessity of preserving the status quo." (*Abrams v. St. John's Hospital & Health Center* (1994) 25 Cal.App.4th 628, 636 [30 Cal.Rptr.2d 603].)

■ "The determination whether to issue a preliminary injunction requires the trial court to exercise its discretion by considering and weighing ' "two interrelated factors," specifically, the likelihood that plaintiffs will prevail on the merits at trial, and the comparative harm to be suffered by plaintiffs if the injunction does not issue against the harm to be suffered by defendants . . . if it does.' " (*Right Site Coalition v. Los Angeles Unified School Dist.* (2008) 160 Cal.App.4th 336, 338 [72 Cal.Rptr.3d 678].) "The more likely it is that plaintiffs will ultimately prevail, the less severe must be the harm that they allege will occur if the injunction does not issue. [Citation.] Further, 'if the party seeking the injunction can make a sufficiently strong showing of

---

[5] In May, 2011, Take Me Home moved for summary adjudication of its breach of contract claim; that motion was granted on August 12, 2011. On August 12, 2011, Take Me Home dismissed its claims for conversion and declaratory relief, and judgment was entered on August 23, 2011. The current appeal, No. B229486, is from the trial court's grant of the injunction, and was consolidated with appeal No. B235513 (*Take Me Home Rescue v. Luri*, Apr. 12, 2012), Luri's appeal from the trial court's grant of summary judgment. Luri's appeal from summary judgment was dismissed due to her failure to timely file an opening brief.

likelihood of success on the merits, the trial court has discretion to issue the injunction notwithstanding that party's inability to show that the balance of harms tips in his [or her] favor.' " (*Id.* at pp. 338–339.)

The determination of whether to grant a preliminary injunction generally rests in the sound discretion of the trial court. (*14859 Moorpark Homeowner's Assn. v. VRT Corp, supra,* 63 Cal.App.4th at p. 1402.) " 'Discretion is abused when a court exceeds the bounds of reason or contravenes uncontradicted evidence.' " (*Id.* at p. 1402.)

## II.  *The Trial Court Did Not Err In Issuing The Injunction*

### A.  *Likelihood of Success on the Merits*

The terms of the parties' agreement, as set forth in the foster care agreement and the parties' oral discussions concerning the spay requirement for Lilly as a shelter dog, establish that the parties had a partially integrated agreement that was supplemented by the collateral oral agreement that Lilly, as a foster dog, must either be spayed or returned to Take Me Home. Thus, Take Me Home has a reasonable likelihood of success on the merits of its breach of contract claim.

■  The parol evidence rule will exclude evidence of a prior or contemporaneous agreement that contradicts the terms of an integrated writing. (*Banco Do Brasil, S.A. v. Latian, Inc.* (1991) 234 Cal.App.3d 973, 1000 [285 Cal.Rptr. 870] (*Banco Do Brasil*).)  ■  The parol evidence rule is a substantive rule of contract law, and whether the rule applies is a question of law. (*Id.* at p. 1001.) If the parol evidence rule is raised as a bar, the party proffering the parol evidence must show the writing was not intended to be the complete agreement of the parties, and that the agreement is susceptible to the meaning proffered. (*Ibid.*) Where the parties execute a written agreement following negotiations, the agreement is at least partially integrated and parol evidence may only be introduced to prove additional terms of the contract which are consistent with the express language of the written agreement. (*Esbensen v. Userware Internat., Inc.* (1992) 11 Cal.App.4th 631, 637 [14 Cal.Rptr.2d 93].) In applying the rule, courts employ a two-step process to determine whether (1) the writing is an integration and (2) the collateral agreement is consistent with the written agreement. (*Gerdlund v. Electronic Dispensers International* (1987) 190 Cal.App.3d 263, 270 [235 Cal.Rptr. 279].)

■  Thus, the central issue here is "whether the parties *intended* the written instrument [(the foster care agreement)] to serve as the exclusive embodiment of their agreement." (*Banco Do Brasil, supra,* 234 Cal.App.3d at p. 1001.) " 'The instrument itself may help to resolve that issue. It may state,

for example, that "there are no previous understandings or agreements not contained in the writing," and thus express the parties' "intention to nullify antecedent understandings or agreements." [Citation.]' [Citation.] Indeed, if such a clause is adopted and used by the parties, it may well be conclusive on the issue of integration. [Citations.]" (*Id.* at pp. 1001–1002.) As explained in *Banco Do Brasil,* "[i]n order to resolve this threshold issue, the court may consider all the surrounding circumstances, including the prior negotiations of the parties. [Citation.] 'In determining the issue, the court must consider not only whether the written instrument contains an integration clause, but also examine the collateral agreement itself to determine whether it was intended to be a part of the bargain. [Citations.] ■ However, in determining the issue of integration, the collateral agreement will be examined only insofar as it does not directly contradict an express term of the written agreement; "it cannot reasonably be presumed that the parties intended to integrate two directly contradictory terms in the same agreement." [Citation.] In the case of prior or contemporaneous representations, the collateral agreement must be one which might naturally be made as a separate contract, i.e., if in fact agreed upon need not certainly have appeared in writing. [Citation.]' " (*Id.* at p. 1002.)

Here, the foster care agreement only provided instructions for the care of Lilly, a foster dog. The foster care agreement did not include the material term that Lilly, as a shelter dog, would either be spayed as required by Food and Agriculture Code section 30503 prior to adoption, or returned to Take Me Home. However, as Luri admitted, the parties separately orally agreed that Lilly would be spayed as soon as she was well enough to tolerate the procedure. As a result, the foster care agreement did not contain the entire agreement of the parties, and was only partially integrated. Luri cannot rely solely on the terms of the parties' written agreement to escape the spaying requirement because the separate oral agreement does not contradict the terms of the foster care agreement—which provides only directions for the dog's care. Finally, Los Angeles City Municipal Code section 53.15.2, permitting a person to keep an intact agility dog, has no application where, as here, one of the parties is a rescue organization and as a result the parties have agreed otherwise.

### B. *Balancing of Harms Favor Take Me Home*

■ A trial court's decision on a motion for a preliminary injunction " 'does not amount to an adjudication of the ultimate rights in controversy. It merely determines that the court, balancing the respective equities of the parties, concludes that, pending a trial on the merits, the defendant should or that he should not be restrained from exercising the right claimed by him [or her].' [Citations.] The general purpose of such an injunction is the preservation of the status quo until a final determination of the merits of the action.

[Citations.] Thus, the court examines all of the material before it in order to consider 'whether a greater injury will result to the defendant from granting the injunction than to the plaintiff from refusing it . . . .' [Citations.] In making that determination the court will consider the probability of the plaintiff's ultimately prevailing in the case and, it has been said, will deny a preliminary injunction unless there is a reasonable probability that plaintiff will be successful in the assertion of his rights. [Citations.] . . . 'In the last analysis, the trial court must determine which party is the more likely to be injured by the exercise of its discretion [citation] and it must then be exercised in favor of that party [citation].' " (*Continental Baking Co. v. Katz* (1968) 68 Cal.2d 512, 528 [67 Cal.Rptr. 761, 439 P.2d 889].)

■  Here, although the Orange County Animal services has stated that it will hold any action against Take Me Home in abeyance pending these proceedings, the balancing of the harms nonetheless favors Take Me Home. Luri is but one pet owner, and can either spay Lilly or adopt another dog; on the other hand, Take Me Home's entire existence depends on its ability to place pets that it obtains from shelters in adoptive homes.

## DISPOSITION

The judgment is affirmed. Respondent is to recover its costs on appeal.

Mallano, P. J., and Chaney, J., concurred.

On September 14, 2012, the opinion was modified to read as printed above.