Filed 4/22/22  NetEase Inc. v. PUBG Corporation CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| NETEASE INC., et al.,<br><br>        Plaintiffs and Appellants,<br><br>v.<br><br>PUBG CORPORATION et al.,<br><br>        Defendants and Respondents. | A160572<br><br>(San Mateo County<br>Super. Ct. No. 20CIV01382) |

This is an appeal from an order granting a preliminary injunction, the effect of which is to enjoin NetEase Inc., NetEase Information Technology Corporation, and Hong Kong NetEase Interactive Entertainment Limited (collectively, NetEase) from engaging in certain behaviors pending the resolution of litigation to determine whether NetEase breached its March 2019 settlement agreement with PUBG Corporation and PUBG Santa Monica, Inc. (collectively, PUBG) (settlement agreement).  NetEase argues on appeal that the trial court abused its discretion in determining both that PUBG was likely to succeed on the merits of its breach of contract claims and that PUBG would be harmed in the absence of the preliminary injunction. NetEase additionally claims that the trial court erred by issuing a preliminary injunction allowing for greater relief than PUBG would be

entitled to at trial. Seeing no abuse of discretion in the granting of the preliminary injunction in this contract dispute, we affirm.[1]

## I.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    *The Parties and Their Products*

The parties possess competing video games in the "battle royale" genre. The battle royale genre of video games "takes its name from the 1999 Japanese novel *Battle Royale* by Koushun Takami.  Battle royale games simulate a free-for-all, 'every man for himself,' battle between a large group of players—often 50 or more.  Players 'win' battle royale games by being the last player left alive at the end of the battle, referred to as the 'last man standing.'  Battle royale games are often set in recently-deserted, but formerly inhabited locations, such as an abandoned city, island, or port town. Players must scavenge among abandoned structures and buildings in order to find weapons, equipment, and supplies that they use to fight the other players."

Bluehole Ginno Games Inc. (Bluehole) released its battle royale game "Playerunknown's Battlegrounds" (Battlegrounds) in approximately March 2017.  PUBG Corp. is the successor in interest to Bluehole with respect to Battlegrounds.  PUBG Santa Monica, Inc. was formed as a wholly owned subsidiary to support the Battlegrounds community in the United States.  Battlegrounds quickly became successful.  Its early-access public beta version sold one million copies in less than a month, faster than any other game had ever sold on Steam, a major online computer game distribution

---

[1] The settlement agreement at issue contains numerous confidentiality provisions, and much of the record in this matter has been filed under seal. Thus, our decision necessarily omits many specific details in order to preserve that confidentiality.

site.  By July 2017, Battlegrounds reached over $100 million in sales.  It broke a Steam record in September 2017 by having 1.35 million players playing at the same time.

NetEase released the battle royale game "Rules of Survival," in November 2017.  It launched another battle royale game, "Knives Out," that same month which was only marketed to a handful of high-income territories, mostly in Japan and Taiwan.  NetEase also created a third game, "Survivor Royale," using the same materials as Knives Out, but translating them into new languages to enable global marketing.  The initial version of Survivor Royale was also released in November 2017.  Thereafter, NetEase added new material to Survivor Royale to differentiate it from Knives Out.  Survivor Royale, however, was never a commercial success.  NetEase disabled downloads of the game in September 2019 so new players could no longer play the game.  In November 2019, the entire game was shut down so that it was no longer accessible to players.

## B.    *Initial Litigation and Settlement*

PUBG became concerned that Rules of Survival and Knives Out "copied a significant number of the same visual and other protectable elements" of Battlegrounds and that the NetEase games "appeared to be trading wholesale on the 'look and feel' of" Battlegrounds through "extensive copying of individual and ensembles of elements."  It therefore filed a lawsuit in federal district court in April 2018, asserting claims for copyright infringement, trade dress infringement, and unfair competition.  (*PUBG Corporation v. NetEase, Inc.* (N.D.Cal., No. 4:18-cv-02010-JSW) (*PUBG I*); see also *PUBG Corporation v. NetEase, Inc.* (N.D.Cal. Mar. 3, 2020, No. 19-cv-06615-JSW) 2020 U.S.Dist. Lexis 37604 (*PUBG II*) [summarizing *PUBG I*].)  NetEase moved to dismiss, arguing that "PUBG's lawsuit was an improper

effort to monopolize the entire 'battle royale' genre of video games" and that "PUBG had not actually identified any elements of *Battlegrounds* which were both (i) protectable in copyright or trade dress and (ii) copied by NetEase."

After mediation and extended negotiations, the parties resolved *PUBG I* by entering into the settlement agreement on March 11, 2019. Among other things, the settlement agreement contains a strict confidentiality provision, so that the parties' business decision to settle could not be misconstrued as indicative of their views on the merits of *PUBG I*. It also includes a mutual general release with respect to the claims asserted in *PUBG I*, including a waiver of Civil Code section 1542. In particular, the settlement agreement provides that each party "fully understands that if the facts with respect to the [settlement agreement] are found hereafter to be other than or different from the facts now believed by it to be true, it expressly accepts and assumes the risk of such possible differences in fact and agrees that the [settlement agreement] shall be and remain effective, notwithstanding any such differences." The parties additionally agreed that the settlement agreement should be construed and enforced in accordance with California law. Having settled the matter, the parties entered a stipulated dismissal of *PUBG I*, and it was dismissed on April 8, 2019.

Six months later, on October 15, 2019, PUBG filed *PUBG II* in federal district court, alleging that NetEase had breached the terms of the settlement agreement. However, in February 2020, the parties jointly asked to brief the issue of whether the federal court had jurisdiction over the matter, given that the stipulated dismissal in *PUBG I* failed to expressly state that the federal court retained jurisdiction. (See *Kokkonen v. Guardian Life Ins. Co. of America* (1994) 511 U.S. 375, 381–382 ["If the parties *wish* to provide for the court's enforcement of a dismissal-producing settlement

4

agreement, they can seek to do so [in the dismissal order]. . . . Absent such action, however, enforcement of the settlement agreement is for state courts, unless there is some independent basis for federal jurisdiction."].)  The lawsuit was subsequently dismissed for lack of subject matter jurisdiction on March 3, 2020.  (*PUBG II*, *supra*, 2020 U.S.Dist. Lexis 37604.)

## C.    *Current Litigation and Preliminary Injunction*

On March 4, 2020, NetEase initiated the current litigation, seeking a declaration that it was not in breach of the settlement agreement.  According to NetEase—since shortly after the execution of the settlement agreement—PUBG had "attempted to manufacture new claims against NetEase under distorted interpretations of the [s]ettlement [a]greement's clear and unambiguous terms," necessitating  declaratory relief as to the parties' "rights and obligations" under the settlement agreement.  PUBG responded by filing a cross-complaint, alleging that NetEase had breached two different terms of the settlement agreement—paragraphs 5.a. and 5.d., hereafter the 5(a) and 5(d) obligations.

PUBG also filed a motion for a preliminary injunction, requesting that NetEase be enjoined from breaching the settlement agreement with respect to the 5(a) and 5(d) obligations pending trial.  In support of its argument that it was likely to succeed on the merits of its breach of contract claim, PUBG pointed to the following:  (1) a single, specific breach of the 5(a) obligation; (2) NetEase's allegedly too narrow construction of a term used in connection with the 5(a) obligation; (3) certain allegedly inadequate responses by NetEase to the 5(a) obligation; (4) several violations of the 5(d) obligation by NetEase; and (5) NetEase's allegedly too narrow construction of the 5(d) obligation.  PUBG asserted, in addition, that it would suffer irreparable harm without the issuance of a preliminary injunction.

On July 23, 2020, the trial court heard argument with respect to PUBG's preliminary injunction motion. NetEase opposed the motion, contending that PUBG's request impermissibly altered the status quo by asking for relief beyond that required by the settlement agreement before the matter was considered by the jury. With respect to the 5(d) obligation, NetEase claimed that PUBG was improperly asking for retroactive relief and that its request was contrary to the plain wording of the obligation. NetEase argued further that altering the status quo as requested by PUBG would cause NetEase significant harm. In contrast, NetEase asserted PUBG had not offered persuasive evidence that it would be harmed absent the injunction.

The trial court granted the preliminary injunction in part and denied it in part, opining that PUBG had shown "a significant likelihood of success on the merits of it claims for breach of contract" with respect to both the 5(a) obligation and the 5(d) obligation in the settlement agreement. The court additionally determined that "PUBG ha[d] demonstrated that it is likely to suffer immediate and irreparable injury as a result of NetEase's conduct because such conduct will irreparably harm PUBG's business reputation and goodwill with its customers." Finally, it found that the "balance of equities favor[ed] PUBG against NetEase." The trial court therefore enjoined NetEase from various behaviors related to the 5(a) and 5(d) obligations. The court also denied NetEase's request to stay the preliminary injunction pending appeal. NetEase timely appealed.

## D. Postinjunction Proceedings

On July 29, 2020, NetEase filed an emergency petition and motion for a temporary stay of the preliminary injunction order in this court, pending the filing of a writ of supersedeas. It claimed a stay was necessary given the

6

"hopelessly vague preliminary injunction" which upset the status quo and provided "an impossible deadline for compliance." We granted a temporary stay of the preliminary injunction the next day and requested further briefing.

On August 19, 2020, we dissolved our temporary stay and denied NetEase's emergency stay petition, instructing the parties to resolve any factual disputes regarding the scope of the preliminary injunction in the trial court in the first instance. NetEase responded by filing a motion for clarification of the preliminary injunction in the trial court on September 1, 2020. Specifically, NetEase was seeking assurance that the preliminary injunction did not require certain specific actions to be taken pending trial with respect to the 5(a) obligation.

While the clarification motion was pending, PUBG filed an application for an order to show cause regarding contempt on October 2, 2020, arguing that NetEase had consistently disobeyed the preliminary injunction order. According to PUBG, NetEase was in contempt for failing to comply with PUBG's understanding of the 5(a) obligation—as reflected in the preliminary injunction—pending trial. As for the 5(d) obligation, PUBG noted that although NetEase had not sought any clarification, it had failed to comply with the preliminary injunction's mandate with respect to the 5(d) obligation.

On October 5, 2020, NetEase filed a petition for writ of supersedeas with this court, arguing that we should "stay the fatally vague and unclear preliminary injunction." NetEase characterized the preliminary injunction motion as a request by PUBG for the trial court to rewrite the settlement agreement in PUBG's favor despite the contract's clear terms. It claimed that, in issuing the preliminary injunction, the trial court failed to make clear whether it was accepting PUBG's broader version of the contractual

7

obligations or improperly ordering NetEase to perform obligations it had already completed. However, NetEase expressly agreed that "[i]f the trial court clarifies that its order simply prohibits NetEase [from taking certain actions], and rejects PUBG's efforts to hold NetEase in contempt, then no stay will be necessary."

The trial court considered both PUBG's contempt request and NetEase's clarification motion together on November 5, 2020. The court granted NetEase's motion, clarifying which actions should not be taken pending trial—as well as those that need not be taken—with respect to the 5(a) obligation. In doing so, the court noted that conforming the preliminary injunction to PUBG's understanding of the 5(a) obligation would be inappropriate because it involved questions that should be left for the jury. Consequently, the court denied PUBG's contempt request.

On November 12, 2020, we requested supplemental briefing addressing whether any action taken by the trial court at the November 5 clarification hearing affected NetEase's pending petition for writ of supersedeas. PUBG argued that the petition was moot given the trial court's clarification that NetEase need not take certain actions with respect to the 5(a) obligation pursuant to the preliminary injunction. Thus, the clarification "eliminated both the merits claim that the injunction is vague and also the possibility of potential harm" which formed the bases for NetEase's writ petition. However, NetEase declined to withdraw the petition unless PUBG agreed that NetEase was not currently in violation of the injunction as clarified. NetEase read the trial court's clarification order as not requiring certain actions with respect to either obligation pending trial. It confirmed that it could not agree to withdraw its writ petition because PUBG would not say that it would not initiate any further contempt proceedings with respect to

8

the 5(a) or 5(d) obligations.  NetEase claimed this threat of further contempt proceedings was sufficient to support its petition.  Relying on NetEase's own statements regarding when its writ petition would no longer be necessary, we denied the petition for writ of supersedeas as moot on November 23, 2020.  The merits of this matter are now before us for decision.

## II.

## DISCUSSION

### A.    *Legal Framework and Standard of Review*

As the name suggests, " '[a] preliminary injunction is an order that is sought by a plaintiff prior to a full adjudication of the merits of its claim.' " (*Amgen Inc. v. California Correctional Health Care Services* (2020) 47 Cal.App.5th 716, 731 (*Amgen*).)  " 'The general purpose of a preliminary injunction is to preserve the status quo pending a determination on the merits of the action.' " (*McCann v. City of San Diego* (2021) 70 Cal.App.5th 51, 98 (*McCann*).)  "In determining whether to issue a preliminary injunction, the trial court considers two related factors: (1) the likelihood that the plaintiff will prevail on the merits of its case at trial, and (2) the interim harm that the plaintiff is likely to sustain if the injunction is denied as compared to the harm that the defendant is likely to suffer if the court grants a preliminary injunction." (*Western Growers Assn. v. Occupational Safety & Health Standards Bd.* (2021) 73 Cal.App.5th 916, 930 (*Western Growers*).)  " 'The latter factor involves consideration of such things as the inadequacy of other remedies, the degree of irreparable harm, and the necessity of preserving the status quo.' " (*Take Me Home Rescue v. Luri* (2012) 208 Cal.App.4th 1342, 1350 (*Take Me Home*).)

"The determination of whether to grant a preliminary injunction generally rests in the sound discretion of the trial court." (*Western Growers*, *supra*, 73 Cal.App.5th at p. 930.)  When determining whether to issue a

9

preliminary injunction, the trial court exercises its discretion by considering and weighing the two interrelated factors. (*Take Me Home*, *supra*, 208 Cal.App.4th at p. 1350.) Thus, " '[t]he more likely it is that plaintiffs will ultimately prevail, the less severe must be the harm that they allege will occur if the injunction does not issue. [Citation.] Further, "if the party seeking the injunction can make a sufficiently strong showing of likelihood of success on the merits, the trial court has discretion to issue the injunction notwithstanding that party's inability to show that the balance of harms tips in his [or her] favor." ' " (*Id.* at pp. 1350–1351.) "The trial court's order on a request for a preliminary injunction 'reflects nothing more than the superior court's evaluation of the controversy on the record before it *at the time* of its ruling; it is not an adjudication of the ultimate merits of the dispute.' " (*People v. Uber Technologies, Inc.* (2020) 56 Cal.App.5th 266, 283 (*Uber*).)

We review a trial court's issuance of a preliminary injunction for abuse of discretion. (*Amgen*, *supra*, 47 Cal.App.5th at p. 731.) The burden is on the party challenging the injunction to make a clear showing of abuse. (*Uber*, *supra*, 56 Cal.App.5th at p. 283.) "Discretion is abused when a court exceeds the bounds of reason or contravenes uncontradicted evidence." (*Western Growers*, *supra*, 73 Cal.App.5th at p. 930.) In contrast, "[t]he court properly exercises its discretion where its determination is supported by substantial evidence. [Citation.] ' ". . . '[T]he trial court is the judge of the credibility of the affidavits filed in support of the application for preliminary injunction and it is that court's province to resolve conflicts.' [Citation.] Our task is to ensure that the trial court's factual determinations, whether express or implied, are supported by substantial evidence. [Citation.] Thus, we interpret the facts in the light most favorable to the prevailing party and indulge in all reasonable inferences in support of the trial court's order." ' "

10

(*Id.* at pp. 930–931.) " 'However, if the "likelihood of prevailing on the merits" factor depends upon the construction of a statute or another question of law, rather than evidence to be introduced at trial, our review of that issue is independent or de novo.' " (*Amgen*, at p. 731.)

Since a determination of the underlying merits in this case will require resolution of the parties' disputes regarding their rights and obligations under the settlement agreement, we review salient principles with respect to contract interpretation. Where the language of a writing is unambiguous, its interpretation is solely a judicial function, with the threshold question of ambiguity also a question of law. (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865 (*Parsons*); *Appleton v. Waessil* (1994) 27 Cal.App.4th 551, 554–555.) We must interpret the contract to give effect to the mutual intention of the parties at the time the contract was formed. And such intent should be ascertained, if possible, from the written provisions of the agreement. (Civ. Code, § 1636; *Thompson v. Miller* (2003) 112 Cal.App.4th 327, 335.) Thus, it is generally the objective intent of the parties as evidenced by the words of the contract that controls. (*Shaw v. Regents of University of California* (1997) 58 Cal.App.4th 44, 54–55.) Whenever possible, the whole of a contract is to be read so that each clause helps to interpret the other and give effect to every part thereof. (Civ. Code, § 1641; *Bear Creek Planning Committee v. Ferwerda* (2011) 193 Cal.App.4th 1178, 1183.)

However, where a contract is reasonably susceptible to two or more meanings, it is ambiguous; and, in the case of ambiguity, extrinsic evidence may be introduced to aid the interpretation of the contract. (*Nava v. Mercury Casualty Co.* (2004) 118 Cal.App.4th 803, 805; *Pacific Gas & Electric Co. v. Zuckerman* (1987) 189 Cal.App.3d 1113, 1140–1141.) For instance, "extrinsic

11

evidence of such objective matters as the surrounding circumstances under which the parties negotiated or entered into the contract; the object, nature and subject matter of the contract; and the subsequent conduct of the parties" may all be considered. (*Morey v. Vannucci* (1998) 64 Cal.App.4th 904, 912 (*Morey*).)[2] When "ascertaining the intent of the parties at the time the contract was executed depends on the credibility of extrinsic evidence, that credibility determination and the interpretation of the contract are questions of fact that may properly be resolved by the jury." (*City of Hope National Medical Center v. Genentech, Inc.* (2008) 43 Cal.4th 375, 395; *Morey*, at pp. 912–913 [same].)

## B.    *Likelihood of Success on the Merits*

As stated above, in granting the preliminary injunction in this case, the trial court opined that PUBG had shown "a significant likelihood that it will prevail on the merits of its claims for breach of contract" with respect to both the 5(a) obligation and the 5(d) obligation under the settlement agreement. NetEase argues on appeal that the trial court abused its discretion in making this finding because none of three possible grounds advanced by PUBG as to why it would succeed on the merits of its breach of contract claims support issuance of the preliminary injunction. We disagree with both NetEase's analysis and its conclusion.

---

[2] Indeed, "[w]here the meaning of the words used in a contract is disputed, the trial court must provisionally receive any proffered extrinsic evidence which is relevant to show whether the contract is reasonably susceptible of a particular meaning. [Citations.] . . . Even if a contract appears unambiguous on its face, a latent ambiguity may be exposed by extrinsic evidence which reveals more than one possible meaning to which the language of the contract is yet reasonably susceptible." (*Morey*, *supra*, 64 Cal.App.4th at p. 912.)

### 1. The 5(a) Obligation

NetEase acknowledges a single, specific violation of the 5(a) obligation, which it corrected around the time PUBG brought the matter to its attention in July 2019.  During the November 2020 clarification hearing, the trial court opined that this 5(a) breach was a violation of the settlement agreement.  Substantial evidence in the record therefore supports the conclusion that PUBG will likely prevail on its breach of contract claim with respect to this specific violation of the 5(a) obligation.

NetEase nevertheless contends that preliminary injunctive relief was inappropriate based on the 5(a) obligation because the company voluntarily corrected this one problem and there was no evidence it was likely to recur.  We address this argument below in our discussion of the balance of harms between the parties.  However, we disagree with NetEase's contention that the conceded 5(a) violation is the only possible breach upon which the trial court could have based its conclusion that PUBG was likely to succeed on the merits at trial with respect to the 5(a) obligation.

As summarized above, PUBG supported its preliminary injunction request by arguing it was likely to succeed on the merits with respect to five different categories of breach of contract claims, not just the three NetEase discusses in its briefing.  NetEase reasons that the trial court could not have based its preliminary injunction on the other two 5(a) categories because, during the hearing on November 5, 2020, the court stated that it "did not seek to enforce the entirety of [PUBG's] Preliminary Injunction Motion" and clarified that the preliminary injunction did not address those two categories.  In addition, the court denied PUBG's application for an order to show cause regarding contempt which was based on those same two alleged 5(a) breaches.  We do not read the trial court's actions so narrowly.

13

In issuing the preliminary injunction, the trial court was clearly and appropriately cognizant of the fact that such injunctions are issued solely to maintain the status quo pending trial. (*McCann*, *supra*, 70 Cal.App.5th at p. 98.) The court did not enjoin behaviors related to the two contested 5(a) obligations because they involved issues of fact for the jury which were inappropriate for resolution at the preliminary injunction stage. As the court opined, had it included these two categories in the injunction, "it would have essentially been a summary judgment determination." Thus, the trial court clarified: "While the Court previously made a finding of likelihood of success on the merits, it did not seek to enforce the entirety of [PUBG's] Preliminary Injunction Motion." In other words, while the trial court did not enjoin any specific behaviors based on these two categories of alleged 5(a) breaches, it does not follow that the trial court failed to include them in its calculation of PUBG's overall likelihood of success in the underlying action as NetEase contends. Moreover, in our view, substantial evidence exists in the record supporting PUBG's likelihood of success with respect to both additional categories of 5(a) breaches.

For instance, one of these two disputed categories involves a disagreement regarding whether a particular term in the settlement agreement should be construed broadly enough to include two specific items. NetEase claims that the disputed term, when understood in its ordinary and popular sense, excludes these two items. It cites several dictionary definitions of the term in support of its position. PUBG, in contrast, argues that the term is defined by reference to another document and must therefore be construed in that context.

We are not convinced that this dispute can be resolved by dictionary definitions. While NetEase points to one common definition, there are others.

14

And, in fact, one of the definitions relied on by NetEase indicates its requirements are only "usually" applicable. More importantly, however, the term must be construed in the context of the settlement agreement as a whole, which specifically defines the term by referencing another document. (See *MacKinnon v. Truck Ins. Exchange* (2003) 31 Cal.4th 635, 649 ["Although examination of various dictionary definitions of a word will no doubt be useful, such examination does not necessarily yield the 'ordinary and popular' sense of the word if it disregards the [contract's] context."].) The question thus becomes not what the term means generally but what it means when it is construed as part of the phrase in which it is used.

Even when read in context, we agree with the trial court that the term is ambiguous. PUBG argues in favor of a very broad reading of the term. Under this broad reading, both items would be included within the disputed term. However, two specific paragraphs in the referenced document are captioned by the disputed term. Thus, a reasonable interpretation of the settlement agreement might be that the 5(a) obligation applies only to items identified in those paragraphs. Under this interpretation, one of the two items at issue is clearly included within the disputed term. The other item is not included in these paragraphs, but it is included in an immediately preceding paragraph describing a broader category of items which could be viewed as including the disputed term. Under all of these circumstances, we conclude that substantial evidence supports the conclusion that PUBG is likely to succeed on the merits of its 5(a) claim with respect to at least one of these two items.

The other category of alleged breaches of the 5(a) obligation involves PUBG's assertion that certain responses by NetEase to its 5(a) obligation were inadequate. This claim hinges on the construction of the third in a

15

series of words contained in the settlement agreement, which define the scope of NetEase's 5(a) obligation. NetEase argues for a narrow construction of this term, while PUBG contends it must be interpreted more broadly. The trial court stated this claim involved fact questions for the jury and thus must have concluded the disputed term was ambiguous. We agree. Since this term in the settlement agreement is reasonably susceptible to the interpretations offered by both sides, we apply appropriate cannons of construction to determine whether there is substantial evidence that PUBG will likely succeed on the merits of this 5(a) claim.

NetEase's construction of the disputed term, if taken to its logical extreme, would lead to an absurd result which could not have been contemplated by the parties when drafting the settlement agreement. (See Civ. Code, § 1638; *Galardi Group Franchise & Leasing, LLC v. City of El Cajon* (2011) 196 Cal.App.4th 280, 288 [a court "must interpret a contract in a manner that is reasonable and does not lead to an absurd result"].) Rather, we find the doctrine of *noscitur a sociis* instructive. "*Noscitur a sociis* means ' "a word takes meaning from the company it keeps." ' [Citation.] Under this rule, ' " '[a] word of uncertain meaning may be known from its associates and its meaning "enlarged or restrained by reference to the object of the whole clause in which it is used." [Citation.]' [Citation.]" [Citation.] " ' "In accordance with this principle of construction, a court will adopt a restrictive meaning of a listed item if acceptance of a more expansive meaning would make other items in the list unnecessary or redundant, or would otherwise make the item markedly dissimilar to the other items in the list." ' " ' " (*People v. Lucero* (2019) 41 Cal.App.5th 370, 398; see also *Blue Shield of California Life & Health Ins. Co. v. Superior Court* (2011) 192 Cal.App.4th 727, 740 [same].)

16

Thus, pursuant to the doctrine of *noscitur a sociis*, the disputed term cannot be so narrowly construed so as to " ' "make the item markedly dissimilar to the other items in the list, " ' " but it also cannot be so broadly construed so as to " ' "make other items in the list unnecessary or redundant." ' " (*Busker v. Wabtec Corp.* (2021) 11 Cal.5th 1147, 1160 & fn. 11 [construing a term so that it is not "markedly different" from other listed terms].)  Here, NetEase's narrow construction of the third listed term in the series would make that term markedly dissimilar from the other two.  On the other hand, the disputed term cannot be read so broadly as to make the other two terms unnecessary or redundant.

Finally, in construing the disputed term, we consider "the surrounding circumstances under which the parties negotiated or entered into the contract; the object, nature and subject matter of the contract; and the subsequent conduct of the parties." (*Morey, supra*, 64 Cal.App.4th at p. 912.) The settlement agreement in this case resolved *PUBG I*, federal litigation between the parties on the question of whether NetEase's battle royale video games infringed PUBG's copyrights and trade dress rights in Battlegrounds. Taking all of these considerations into account, we determine that substantial evidence supports the conclusion that PUBG will likely succeed to some degree on the merits of this category of 5(a) claims.

In sum, substantial evidence supports the trial court's conclusion that PUBG had shown "a significant likelihood that it will prevail on the merits of its claims for breach of contract" with respect to the 5(a) obligation under the settlement agreement.

### 2. *The 5(d) Obligation*

PUBG cites two items which it contends are a clear violation of the 5(d) obligation under the settlement agreement.  However, NetEase argues that

this conduct cannot support the issuance of the preliminary injunction because the actions are attributable to two Southeast Asia companies—Nguyen Bao Digital Company Limited and VNG Singapore PTE. LTD. (collectively, VNG)—who are not agents of NetEase. We will leave the dispute regarding VNG's status for further development and determination by the trial court in the first instance. Thus, we do not consider these two potential violations when determining whether PUBG will likely prevail on its breach of contract claim with respect to the 5(d) obligation.

The parties also discuss a potential single violation of the 5(d) obligation which PUBG brought to NetEase's attention in July 2019. NetEase arranged for the potential violation to be corrected. There is a timing issue with respect to the 5(d) obligation which we discuss at length below. Although the exact date that this single alleged 5(d) violation first occurred is not entirely clear on this record, substantial evidence supports the conclusion that PUBG will likely prevail on its breach of contract claim with respect to this specific violation of the 5(d) obligation, regardless of how the timing issue is resolved.

The bulk of the parties' dispute with respect to the 5(d) obligation involves how certain conduct should be viewed from a temporal perspective. NetEase argues that conduct which began before a certain date is not prohibited by the settlement agreement. PUBG, in contrast, maintains that certain continuing conduct falls within the 5(d) obligation. We consider the trial court's rulings on the matter and the relevant contractual language to determine which party is more likely to succeed on the merits of this claim.

As stated above, the threshold determination regarding whether a contract is ambiguous is a question of law. (*Parsons*, *supra*, 62 Cal.2d at p. 865.) However, the record is unclear in this case whether the trial court

has made this preliminary determination. At the July 2020 hearing on the preliminary injunction, the court indicated that, with respect to the 5(d) obligation, the "preliminary injunction is granted as requested." But neither the requested language nor the actual wording of the preliminary injunction definitively resolves the temporal issue. Later in the hearing, the court stated that the injunction was prospective only and related the 5(d) obligation back to the requirements of the settlement agreement. NetEase did not seek clarification of the injunction with respect to the 5(d) obligation. Nevertheless, in its November 2020 clarification order, the court again tied the 5(d) obligation to the terms of the settlement agreement.

Arguably, then, the trial court was simply enjoining conduct with respect to the 5(d) obligation to the extent it is prohibited by the settlement agreement without, at this stage, defining exactly what that means. We therefore turn to the contract language to inform our analysis of each party's likelihood of succeeding with respect to its interpretation of the obligation. For purposes of this analysis we conclude, given the information before us at this point in the proceedings, that the language of the 5(d) obligation is ambiguous.[3]

In reviewing the 5(d) obligation in the context of the settlement agreement as a whole, we find it interesting that the obligation uses a generic term twice for a very important concept—a concept which the parties took great care to specifically define in at least three different ways elsewhere in the agreement, including in paragraphs 1.c. and 1.d. We also look to the

---

[3] The trial court is, of course, free to review all the extrinsic evidence with respect to the 5(d) obligation at a later point in these proceedings and conclude as a matter of law that the 5(d) obligation is not reasonably susceptible to more than one meaning and is therefore unambiguous. (See *Morey*, *supra*, 64 Cal.App.4th at p. 912.)

wording of the 5(a) obligation, to which the 5(d) obligation refers. The 5(a) language includes one of the defined terms for the concept but also includes another use of the generic term in reference to the agreement's exhibit B. A review of that exhibit reveals a broad series of obligations, beyond those involving just the concept as specifically defined, apparently limited only by paragraph 5(e) of the agreement.

It is thus clear that, as a general matter, the 5(d) obligation is intended to capture a broader group of behaviors than those related to the time-specific defined term NetEase points to in its argument. Moreover, there is no temporal limitation included in the 5(d) obligation, and one could easily have been inserted. On this basis, it could be concluded that if a particular item falls within the purview of the 5(a) obligation, the 5(d) obligation applies generically to current conduct, regardless of the time limitation NetEase suggests. This interpretation provides substantial evidence that PUBG would likely succeed on the merits of its 5(d) claim.

However, even if NetEase is correct that the 5(d) obligation at issue in this case only applies to the concept as limited by the time-specific defined term it suggests, we still conclude that substantial evidence supports PUBG's likelihood of success on the merits. In short, we disagree with NetEase that the crucial determination is when and in what exact context a behavior began. Instead, the key is *current* conduct. This interpretation is not retroactive, as the trial court recognized, but addresses forward-looking behaviors as much as words like "create" or "publish" would have. It is simply an acknowledgment of how the particular technology at issue often works. Indeed, NetEase concedes that individuals can currently be exposed to old behaviors. Thus, older behaviors, even if specifically dated, that

continue to exist are still part of the universe of behaviors that accompany and will continue to impact the time-limited version of the concept.

In reaching this conclusion, we reject NetEase's assertion that such a reading of the 5(d) obligation renders the defined terms with respect to the concept at issue unnecessary to the settlement agreement. The definitions are still necessary both to set a baseline for compliance under paragraph 1.d. of the settlement agreement and to make clear what was and was not required under the 5(a) obligation with respect to the NetEase games. We also disagree that these behaviors were released by the settlement agreement. Obviously, if actions are required by the settlement agreement with respect to current behaviors, they were not released by the settlement agreement. Rather, we conclude that, under either of the contractual interpretations discussed above, substantial evidence supports the conclusion that PUBG will likely succeed on the merits of its 5(d) breach of contract claims.

## C.    *Balance of Harms*

As discussed above, in considering whether to grant a preliminary injunction a trial court weighs the "likelihood the party seeking relief will prevail on the merits" against the "relative interim harm to the parties if the preliminary injunction is granted or denied." (*Uber, supra*, 56 Cal.App.5th at p. 283.) "The goal is to minimize the harm that an erroneous interim decision would cause." (*Ibid.*) We have concluded that substantial evidence supports the trial court's determination in this case that PUBG has shown "a significant likelihood that it will prevail on the merits of its claims for breach of contract" with respect to both the 5(a) obligation and the 5(d) obligation under the settlement agreement. Under such circumstances, a less severe showing of harm is sufficient to support the injunction. (*Take Me Home*,

21

*supra*, 208 Cal.App.4th at pp. 1350–1351.) We conclude that the trial court's finding that the balance of harms in this case tips in favor of PUBG is supported by substantial evidence.

We first consider the harm to NetEase of an erroneous interim decision. Interestingly, NetEase does not even attempt to make an argument of interim irreparable harm. And such an argument would be difficult to formulate as the trial court clarified in its November 2020 order that certain actions were not required by NetEase under the preliminary injunction with respect to the 5(a) obligation pending trial. Moreover, with respect to the 5(d) obligation, if NetEase was not required to undertake the actions it says it voluntarily began pending trial,[4] it makes no argument that monetary damages would be insufficient to compensate it for its losses.

With respect to harm to PUBG, NetEase contends there was no evidence of harm from the isolated breaches of the settlement agreement identified by PUBG because NetEase voluntarily corrected the problem months before the issuance of the preliminary injunction, and there was no evidence that any such acts were likely to be repeated in the future. (See *Choice-in-Education League v. Los Angeles Unified School Dist.* (1993) 17 Cal.App.4th 415, 431 [no showing of irreparable interim harm where no evidence the alleged illegal behaviors were likely to recur].) However, we have concluded that PUBG's likelihood of success on the merits, and thus its likelihood of irreparable harm, is based on claims much broader than those few allegations. Given the record in this case—including the identified

---

[4] In its response to PUBG's request for an order to show cause regarding contempt, NetEase reported that, after this court denied its stay request in August 2020, it took significant actions to comply with PUBG's understanding of the 5(d) obligation, which it believed could be covered by the terms of the preliminary injunction.

breaches, the timing of NetEase's various responses to PUBG's allegations both before and after the issuance of the preliminary injunction, and the likelihood that PUBG is still suffering with respect to certain continuing violations—we determine that substantial evidence supports the conclusion that, absent the injunction, breaches were likely to recur.

Moreover, the settlement agreement contemplates that PUBG may incur substantial harm from even a single breach of the 5(a) obligation. Each party cites *DVD Copy Control Assn., Inc. v. Kaleidescape, Inc.* (2009) 176 Cal.App.4th 697 (*Kaleidescape*) as support for its view of the efficacy of the contractual language of the settlement agreement. *Kaleidescape* is a permanent injunction case which held, "Irreparable harm may be established where there is the fact of an injury, such as that arising from a breach of contract, but where there is an inability to ascertain the amount of damage. In other words, to say that the harm is irreparable is simply another way of saying that pecuniary compensation would not afford adequate relief or that it would be extremely difficult to ascertain the amount that would afford adequate relief." (*Id.* at p. 722.) After noting that " 'the trial court's discretion is by no means as broad as that which it might exercise in weighing the equities of the parties' positions for the purpose of deciding whether to issue a *preliminary* injunction,' " the court held with respect to a permanent injunction that "a court must reject a stipulation contemplating an equitable remedy that is contrary to law or public policy, such as where the evidence shows that an aggrieved party actually has an adequate remedy at law. Otherwise, the court should honor the parties' agreement and enforce the stipulation." (*Id.* at pp. 721, 726, fn. omitted; see *Grail Semiconductor, Inc. v. Mitsubishi Electric & Electrics USA, Inc.* (2014) 225 Cal.App.4th 786, 799–801 & fn. 12 [no abuse of discretion in denying a permanent injunction

23

despite stipulation in nondisclosure agreement (NDA); insufficient evidence that monetary damages would be insufficient where no evidence that Mitsubishi was engaging in continuing conduct in violation of the NDA].)

Both parties overstate the importance of this precedent at this juncture in the proceedings. Whether and how PUBG can prove damages for breach of contract and/or the necessity of a *permanent* injunction posttrial remains to be seen. Here, the trial court found that, absent the preliminary injunction, PUBG "is likely to suffer immediate and irreparable injury as a result of NetEase's conduct because such conduct will irreparably harm PUBG's business reputation and goodwill with its customers," and we believe the parties' own contractual language provides some support for this finding. (*Kaleidescape, supra*, 176 Cal.App.4th at p. 722 ["to say that the harm is irreparable is simply another way of saying that pecuniary compensation would not afford adequate relief or that it would be extremely difficult to ascertain the amount that would afford adequate relief"].) Interpreting the facts in the light most favorable to the prevailing party and indulging in all reasonable inferences in support of the trial court's order, we conclude that this language, along with the evidence of reputational harm presented by PUBG, constitute substantial evidence supporting the trial court's finding.

In this regard, we disagree with NetEase's contention that conduct or information from before the execution of the settlement agreement is irrelevant to an analysis of harm. The question is not whether this conduct was somehow "released" by the settlement agreement, it is whether facts supporting possible customer confusion and PUBG's drop in revenues and active users in the wake of the release of NetEase's games can reasonably be read as some evidence that PUBG's ability to control Battleground's brand reputation and goodwill with its customers was negatively impacted by the

24

NetEase games.  Under such circumstances, compliance with the resulting settlement agreement could be deemed necessary to mitigate these harms. And the threat of imminent losses that cannot be compensated at trial are the very harms preliminary equitable relief are intended to address.  (See *Broker Genius, Inc. v. Volpone* (S.D.N.Y. 2018) 313 F.Supp.3d 484, 496 [" 'irreparable harm through loss of reputation, good will, . . . business opportunities,' or loss of customer relationships can justify injunctive relief on a breach of contract claim," citing cases].)[5]

In the end, the goal of a preliminary injunction is to "minimize the harm that an erroneous interim decision would cause."  (*Uber*, *supra*, 56 Cal.App.5th at p. 283.)  The task is essentially "a predictive one."  (*Id.* at p. 301.)  Given the strong showing made by PUBG with respect to its likely success on the merits of its claims and a balance of harms that clearly tipped in PUBG's favor, we cannot say that the trial court abused its discretion by concluding that PUBG would likely suffer irreparable harm without an injunction ordering that, at the least, NetEase comply with the undisputed terms of the settlement agreement pending trial.

## D.    *Scope of Preliminary Injunction*

NetEase finally argues that the preliminary injunction is improper as a matter of law because it exceeds the relief PUBG would be entitled to at trial. (See *O'Connell v. Superior Court* (2006) 141 Cal.App.4th 1452, 1463 [" ' "[t]he scope of available preliminary relief is necessarily limited by the scope of the

---

[5] *Frangipani v. Boecker* (1998) 64 Cal.App.4th 860, 865, cited by NetEase, is not a preliminary injunction case and is thus readily distinguishable.  (Compare *Take Me Home*, *supra*, 208 Cal.App.4th at p. 1350 [analysis of harm in preliminary injunction context " 'involves consideration of such things as the inadequacy of other remedies, the degree of irreparable harm, and the necessity of preserving the status quo' "].)

relief likely to be obtained at trial on the merits" ' "].) Specifically, NetEase claims that the court's injunction enjoins behaviors with respect to both the 5(a) obligation and the 5(d) obligation that are potentially broader than the corresponding language in the settlement agreement requires. Again, we disagree.

With respect to the 5(a) obligation, NetEase complains that a word used in the preliminary injunction is vague, potentially requiring it to engage in conduct beyond that required by the settlement agreement. However, the injunction uses the word in connection with certain explicit battle royale first-person shooter games developed by NetEase. Similar language is found in the settlement agreement in exhibit B, and it seems clear that the word in the injunction must be limited by and construed in this context.[6] Indeed, pursuant to paragraph 5.e. and exhibit B of the settlement agreement, it is not only possible but very likely that NetEase's obligations under the settlement agreement are broader than the conduct enjoined by the court pending trial. In short, we see no ambiguity here.

As for the enjoined behaviors with respect to the 5(d) obligation, we have already determined that substantial evidence supports the conclusion that PUBG is likely to succeed on the merits of its claim for a broader reading of that obligation under the settlement agreement than NetEase advocates. More importantly, however, NetEase ignores the court's clarification order

---

[6] At oral argument in this matter, counsel for NetEase repeatedly argued that the expansive language of the preliminary injunction with respect to the 5(a) obligation runs afoul of a bargained-for limitation on NetEase's obligations under the settlement agreement which is set forth in paragraph 5.e. As set forth above, we disagree. Read in context, the enjoined behavior is limited to items like the defined term in the preliminary injunction, which is actually narrower than NetEase's obligations under paragraph 5.e.

which specifically relates NetEase's 5(d) obligations under the injunction back to the terms of the settlement agreement. Thus, the settlement agreement is the touchstone here. No conduct is required under the injunction beyond that which is required by the contract, itself.

* * *

We cannot say it any more clearly than the trial court did during the hearing on the clarification motion: "What you have is a settlement agreement [with certain things] set forth in it. I still don't understand why there's been confusion about that. It's the language counsel came up with to resolve the federal litigation. It's the language I used in my ruling on this matter. It's the language I'm using again. There's no ambiguity here. There just isn't. I'm just intending to make sure that the settlement agreement is being complied with until the trial is held. That's it. Nothing more; nothing less." For all the reasons set forth here, we find no abuse of discretion in the trial court's issuance of the preliminary injunction. To the extent the parties' own words have created ambiguities, those are questions which the court properly deferred to another day.

## III.

## DISPOSITION

The judgment is affirmed. PUBG is entitled to its costs on appeal.

EAST, J.*

WE CONCUR:


HUMES, P. J.


MARGULIES, J.


A160572
*NetEase, Inc. v. PUBG Corporation*

---

\* Judge of the San Francisco Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.